702 A.2d 261

**Ivan Fitzherbert LOVELL**

v.

**STATE of Maryland.**

**No. 97, Sept. Term, 1996.**

Court of Appeals of Maryland.

Nov. 12, 1997.

Wilner, J., concurred and filed opinion in which Chasanow, J., joined.

624

Melissa M. Moore, Geraldine K. Sweeney, Asst. Public Defenders (Stephen E. Harris, Public Defender, on brief), Baltimore, for Appellant.

Ann N. Bosse, Asst. Atty. Gen. (J. Joseph Curran, Jr., Atty. Gen., on brief), Baltimore, for Appellee.

Argued before BELL, C.J., and ELDRIDGE, RODOWSKY, CHASANOW, KARWACKI *, RAKER and WILNER, JJ.

RODOWSKY, Judge.

This is an automatic review of a death sentence in a case removed from Somerset County to Talbot County. On an agreed statement of facts the defendant pled guilty to murder. A jury imposed the death sentence.

On the night of October 16–17, 1995, the petitioner, Ivan Fitzherbert Lovell (Lovell), a drug dealer, was returning to North Carolina after having been resupplied by a source in New York City. Lovell was driving a red 1992 Plymouth

---

* Karwacki, J., now retired, participated in the hearing and conference of this case while an active member of this Court; after being recalled pursuant to the Constitution, Article IV, Section 3A, he also participated in the decision and the adoption of this opinion.

Sundance that he had borrowed for the trip, and he was accompanied by one William Smith Lynch who was seated in the front passenger seat. Lovell was transporting two packages of crack cocaine weighing 159.5 grams and 173.9 grams, and a package of powder cocaine weighing 162.9 grams. The street value of this illicit cargo was $63,480. Lovell was armed with a .45 caliber semi-automatic handgun. Shortly before 1:00 a.m., while southbound on U.S. Route 13, one or two miles south of Princess Anne in Somerset County, Maryland, the vehicle's speed was seventy-four miles per hour in a fifty-five mile-per-hour zone.

At that time and place Trooper First Class Edward A. Plank (Tfc. Plank) and one of his road partners, Trooper Dennis Allan Lord (Trooper Lord), of the Maryland State Police were on road patrol duty on the 11:00 p.m.–7:00 a.m. shift out of the Princess Anne Barrack. Each wore a Maryland State Police uniform and each was using an unmarked State Police automobile equipped with flashing lights and sirens. Tfc. Plank, who was operating a stationary radar, measured the speed of the red Sundance and gave pursuit. Almost immediately thereafter Trooper Lord pursued a pickup truck for a headlight violation, and Trooper Lord stopped that truck approximately 300 yards north of the place where Tfc. Plank had stopped the Sundance.

The driver of the Sundance did not produce a motor vehicle operator's license, but he did produce an employee identification card in the name of Charles E. Billups, Jr. from an auto body repair shop in Kill Devil Hills, North Carolina. Tfc. Plank requested the Berlin Barrack to run a license and registration check, and he wrote two traffic citations for "Charles Edward Billups, Jr.," one for speeding and the other for failure to display a driver's license on demand. Tfc. Plank had the driver sign the citations, but the officer did not furnish the driver copies at that time, apparently awaiting the report from the Berlin Barrack. The parties stipulated that "Tfc. Plank then noticed what appeared to be the name of Ivan F. Lovell written on the two citations—the name had been overwritten with the name of Charles Billups." At that point Tfc.

Plank radioed for backup by Trooper Lord who then drove south on Route 13 and parked behind Tfc. Plank's vehicle.

After having conversed with Tfc. Plank in the latter's vehicle, Trooper Lord returned to his car to get his handheld radio. As Trooper Lord was walking back toward Tfc. Plank's car, Tfc. Plank walked to the driver's side of the Sundance. Trooper Lord heard a conversation, saw a flash of light, heard a gunshot, and saw Tfc. Plank fall to the ground. Trooper Lord immediately fired two shots at the driver's side of the Sundance. The driver fired at least two shots at Trooper Lord who completely discharged his weapon in returning fire before the Sundance sped away. Trooper Lord radioed for assistance, but Tfc. Plank was dead.

The bullet had entered one-quarter of an inch to the left of the tip of Tfc. Plank's nose and proceeded on a slightly downward angle to the base of the skull where it severed the brain stem. The shot had been fired from a distance of twelve to eighteen inches from Tfc. Plank's face where it left a three-inch spread of gunpowder. Tfc. Plank had not removed his sidearm from its holster.

Trooper Lord knew that one of his shots had broken the rear window of the Sundance. Actually, one of his shots had passed through Lovell's right forearm, shattering the midportion of the radius, but leaving the ulna intact. In addition, Lovell had suffered a superficial gunshot wound of the scalp.

Lovell proceeded in the Sundance to the vicinity of 6302 Crisfield Highway where he found a pond into which he partially submerged the car. At some point Lynch and Lovell had separated.[1] Lovell went on foot to a house at the stated address—the home of Andrew and Marguerite Robinson— where he rang the doorbell on four or five occasions between 1:30 a.m. and 2:00 a.m. The Robinsons did not answer because they saw no car. Lovell then broke into the Robinsons' home through a back bedroom window. Mr. Robinson

---

[1]. Lynch was arrested about 2:20 p.m. on October 17, 1995, 2.2 miles from the murder scene.

attacked Lovell by swinging an aluminum extension handle from a vacuum cleaner. The parties have stipulated that Mrs. Robinson "ran through the house ... to call 911.... Lovell ... grabbed [Mrs.] Robinson and put a pistol to her head. [Mr.] Robinson struck ... Lovell and they struggled on the floor. [The] Robinson[s] would testify that during this period of time, ... Lovell fired four or five shots in the house."

The Robinsons subdued Lovell and held him until the police arrived. A .45 caliber handgun, lying next to Lovell, was recovered by the police. Lovell was taken to Peninsula Regional Medical Center where his wounds were treated and three pins were inserted to repair the comminuted fracture in his right forearm. He was discharged from the hospital six days later, on October 23, 1995.

As quoted in the stipulation, Lovell, who is African American, told one of the hospital nurses the following:

" 'I guess this is the last time you going to see me. Well, maybe you'll see me in a few years when I'm dead. I guess I'm not going to go to heaven because I'm afraid of dying. I'm afraid to die. The caucasians can kill a whole nation of my people, but you kill a cop and they made a big deal out of it.' When [the nurse] asked if [Lovell] was sorry for what he did he responded, 'No, not really.' "

When a Commissioner of the District Court of Maryland conducted an initial appearance interview of Lovell at the hospital, Lovell stated, "I did it."

The parties also stipulated concerning physical evidence. This includes the fact that the .45 cartridge cases found in the Robinsons' residence and the .45 cartridge cases found at the murder scene were fired from the same handgun. Further, Lovell's right thumb print was found on one of the traffic citations written by Tfc. Plank to Charles Billups. In addition, chips of red paint found at the murder scene were consistent with the paint on the Sundance recovered from the pond near the Robinsons' home.

Represented by the Chief of the Capital Defense Division of the Maryland Public Defender's Office, Lovell entered a guilty

plea to the first-degree, premeditated murder of Tfc. Plank. He also pleaded guilty to assault with intent to murder Trooper Lord, burglary of the Robinsons' home, assault upon each of them, use of a handgun in the commission of a crime of violence, and possession of a controlled dangerous substance with intent to distribute.

Lovell elected to be sentenced by a jury for the capital murder. In a proceeding that began on June 24, 1996, and ended on June 27, 1996, approximately one-half of which was consumed in selecting a jury, the jury imposed a sentence of death. Aggravating factors found by the jury were that Tfc. Plank was "a law enforcement officer who was murdered while in the performance of his duties" and that Lovell had committed the murder "in furtherance of an escape or an attempt to escape from or evade the lawful custody, arrest, or detention of or by an officer or guard of a correctional institution or by a law enforcement officer." Maryland Code (1957, 1996 Repl. Vol.), Art. 27, § 413(d)(1), (3). The jury had been instructed to find the existence of one statutorily listed mitigating factor, i.e., the absence of any previous conviction for a crime of violence. The jury unanimously found that there were no other mitigating factors, either among those statutorily listed, see Art. 27, § 413(g)(2) through (7), or otherwise, see Art. 27, § 413(g)(8). After the jury rendered its death sentence, the court imposed consecutive sentences for the remaining convictions totaling 110 years.

On this appeal Lovell raises issues concerning:

I. The voluntariness of his guilty plea;

II. His being required to appear before the jury with his hands and feet shackled;

III. The sufficiency of the evidence to support the § 413(d)(3) aggravating factor;

IV. The failure of the trial court to respond to the jury's inquiry concerning the mitigating factor of youthful age;

V. The exclusion of five venirepersons for cause; and

VI. The alleged lack of a fair cross-section in the venire.

Additional facts will be stated in the discussion of the respective issues.

## I

Lovell seeks to have his guilty plea to first-degree murder stricken because the record does not reflect that it was made "with understanding of the nature of the charge." Maryland Rule 4–242(c).[2] More specifically, Lovell contends that

"there is nothing on the record to indicate that appellant understood, when he pled guilty ... that he was admitting he murdered Trooper Plank with premeditation, delibera-tion, and wilfulness.... The *nature* of the charge of first degree murder is that it differs from all other types of murder in the intent.... The requisite intent which the accused must possess at the time of a killing in order to be convicted of first degree murder is described by three words: wilful, deliberate, and premeditated."

Brief of Appellant at 16–17. Because there is a "fine and often difficult distinction between first degree murder and the intent-to-kill variety of second degree murder," *Willey v. State,* 328 Md. 126, 138, 613 A.2d 956, 961 (1992), Lovell concludes that "it is inconceivable that a typical defendant would understand, without clear explanation, the difference" between the two degrees of murder. Brief of Appellant at 17.

By a criminal information the State charged that Lovell "did feloniously, wilfully and of deliberately premeditated malice aforethought kill and murder Trooper E.A. Plank." That information was served on Lovell at the hospital on October

---

**2.** Maryland Rule 4–242 provides, in pertinent part:

"**(c) Plea of Guilty.**—The court may accept a plea of guilty only after it determines, upon an examination of the defendant on the record in open court conducted by the court, the State's Attorney, the attorney for the defendant, or any combination thereof, that (1) the defendant is pleading voluntarily, with understanding of the nature of the charge and the consequences of the plea; and (2) there is a factual basis for the plea. The court may accept the plea of guilty even though the defendant does not admit guilt. Upon refusal to accept a plea of guilty, the court shall enter a plea of not guilty."

18, 1995. That same day Lovell signed an acknowledgment for a District Court Commissioner that he had read the charging document or had it read to him. The Commissioner certified that Lovell had read it.

■ Lovell's argument seems to be that the record should reflect that he was given an explanation or definition of the concepts of willfulness, deliberation, and premeditation, and, apparently in addition, that those elements of first-degree, premeditated murder were contrasted for him with the elements of murder in the second degree. It was settled, however, in *State v. Priet,* 289 Md. 267, 424 A.2d 349 (1981), involving the predecessor to Rule 4–242(c), that the required "understanding of the nature of the charge" is not a requirement "that the precise legal elements comprising the offense be communicated to the defendant as a prerequisite to the valid acceptance of his guilty plea." *Priet,* 289 Md. at 288, 424 A.2d at 359. Understanding the nature of the offense affords the defendant "a basic understanding of its essential substance, rather than of the specific legal components of the offense to which the plea is tendered." *Id.* at 288, 424 A.2d at 359–60. Obviously, because recital of the elements of the crime is not required, a contrasting of the elements of the subject crime with those of a related crime is not required.

*Harris v. State,* 295 Md. 329, 455 A.2d 979 (1983), was a review of a death sentence imposed after the defendant had pled guilty. *Id.* at 330–31, 455 A.2d at 980. In this Court the defendant contended that his plea was not knowing and voluntary because he intended only to plead to felony murder but the trial court treated the plea as applicable to both modes of committing murder in the first degree. *Id.* at 334–35, 455 A.2d at 981. We agreed that the record clearly demonstrated that "the appellant did not agree that he committed the murder in a wilful, deliberate and premeditated manner." *Id.* at 336, 455 A.2d at 983. There was no merit to Harris's contention, however, because the trial judge had "explained the *nature* of first degree murder and we [had] no doubt that the appellant understood the *nature* of that offense." *Id.*

(emphasis added). Of significance here is the fact that the trial court in *Harris* explained the nature of murder in the first degree by explaining the two ways in which it could be committed, one of which was "by proving the killing was wilful, deliberate and premeditated." *Id.* at 333, 455 A.2d at 981. Here the State relies exclusively on the premeditation alternative that was described in the charging document. The first-degree murder to which Lovell pled is one of those crimes, "[t]he nature of [which] is readily understandable from the crime itself." *Priet,* 289 Md. at 288, 424 A.2d at 360.

*Priet* involved three separate cases consolidated for argument. We held:

> " '[I]t may be appropriate to presume that in most cases defense counsel routinely explain the nature of the offense in sufficient detail to give the accused notice of what he is being asked to admit.' [Quoting *Henderson v. Morgan,* 426 U.S. 637, 647, 96 S.Ct. 2253, 2258, 49 L.Ed.2d 108, 116 (1976) ]. In each case, the personal responses of the defendant to the questions asked of him were made of record. In each case, the defendant acknowledged that he understood that he was pleading guilty to the particular offense involved, although in no instance does the record particularize the precise basis of the defendant's claimed knowledge that he understood the nature of the offense. It would, we think, in each of the cases before us, exalt formalism over real substance, far beyond the requirements of due process or [the predecessor to Rule 4–242(c) ], to require that the record disclose the reasons for the defendant's belief that he understands the nature of the offense; indeed, such a standard would be wholly impracticable, if not impossible of compliance. The test, as we have indicated, is whether, considering the record as a whole, the trial judge could fairly determine that the defendant understood the nature of the charge to which he pleaded guilty."

*Priet,* 289 Md. at 290–91, 424 A.2d at 361.

In the instant matter Lovell was represented by one of Maryland's most experienced attorneys in defending capital

cases. The plea was entered pursuant to a written plea agreement which incorporated an agreed statement of facts that supported the plea. Defense counsel represented to the circuit court that he had met between fifteen to twenty times with Lovell and had indicated a willingness to meet further with him if he had had any questions. On the day preceding the entry of the guilty plea, defense counsel had taken a draft of the agreement to Lovell at the Worcester County Detention Center. Defense counsel read the agreement aloud while Lovell followed along line by line. Defense counsel then went to the State's Attorney's Office in Somerset County with proposed revisions which were agreed upon. Defense counsel then returned to the Worcester County Detention Center, gave Lovell a further opportunity to read the revised document, and advised him of the changes. At that time Lovell signed the agreement and his counsel witnessed it.

Beneath Lovell's signature on the plea agreement defense counsel signed a statement reading, in part: "To the best of my knowledge and in my opinion, [Lovell's] decision to enter into this agreement is an informed and voluntary one."

When the guilty plea was tendered to the circuit court, the circuit court interrogated Lovell from a preprinted form containing thirty-nine questions. Lovell acknowledged receiving a written copy of the charges. He answered affirmatively to the question: "Do you understand the nature of the charge(s) against you and have you told your attorney everything you can about the case that might assist you in your defense?"

In addition to having a record made by the court reporter of the guilty plea proceedings, the circuit judge wrote the affirmative or negative responses by Lovell on the written form from which the court was questioning and which is headed, "Request for Acceptance of Guilty Plea(s)."

As reported in the transcript, the thirty-sixth question by the court read:

"Mr. Lovell, you may plead guilty because you are in fact guilty or because you believe it is in your best interest to

plead guilty. For which of those reasons, or both, do you wish to plead guilty this afternoon?"

The transcript records that Lovell replied: "The fact that I am guilty and the fact that it's my best interest."

On the form, the court had recorded as the answer to question thirty-six only "it is in my best interest." At the conclusion of questioning, the court had Lovell and his counsel review the form as it had been completed by the court, preliminary to their signing the form. In that review defense counsel noticed that the court's record of Lovell's answer to question thirty-six was incomplete. Lovell, in his own hand, thereupon added to the answer on the court's form, "I am pleading guilty because I am guilty." Lovell and his counsel initialed the inserted matter, and Lovell signed the completed form.

Defense counsel then signed a certificate that is affixed to the completed form. In part that certificate states: "I have advised the Defendant as to the nature of all charges (including those as to which no plea is offered)." The certificate concludes with the statement: "In my opinion, the plea(s) of guilty . . . are voluntarily made . . . with the Defendant's full understanding of the nature of all charge(s) involved. . . ."

The circuit court's determination that Lovell understood the nature of the charge of first-degree, premeditated murder is supported by the record.

Lovell also asserts that his plea was involuntary because it was entered despite the fact that defense counsel had advised him not to plead guilty. We agree with the State's response that the disagreement furnishes "all the more reason to presume that counsel undertook every conceivable measure and made all available arguments in an attempt to persuade Lovell not to enter a plea on the death-eligible crime of first degree murder." Further, "the failure of counsel to approve the decision of the accused to plead guilty [does not] annul the plea if it comports with constitutional standards." *Witherspoon v. State,* 26 Md.App. 54, 60, 336 A.2d 819, 823 (1975).

■ Lovell claims that "there was no benefit flowing directly to [him] from the plea bargain. The benefit was that [Lovell's] accomplice would not be charged in state court with any crimes stemming from the incident. Clearly, [Lovell] gained nothing from this bargain." Brief of Appellant at 19. In *Harman v. Mohn*, 683 F.2d 834 (4th Cir.1982), the court explained that the fact that a plea bargain contemplates leniency for a third person does not automatically invalidate the plea. The court stated:

"Plea bargains, which include adverse or lenient treatment for some person other than the accused, are not per se invalid, but these situations demand that prosecutors exercise a high standard of good faith in negotiating such pleas and that courts accepting such pleas examine them carefully to insure that the accused understands the plea agreement and the consequences not only to himself, but to such third persons as may be affected by the plea bargain."

*Id.* at 838.

■ Because his attorney did not have co-counsel at sentencing, Lovell contends that the guilty plea is deficient. In *Gilliam v. State*, 331 Md. 651, 629 A.2d 685 (1993), *cert. denied*, 510 U.S. 1077, 114 S.Ct. 891, 127 L.Ed.2d 84 (1994), a similar claim was rejected by this Court on post-conviction review. There we noted that

"Gilliam cites no case that recognizes a right to multiple counsel, and we refuse to create such a requirement. As long as a defendant receives adequate representation, it may be provided by a single attorney acting without a 'second chair' at trial."

*Id.* at 676, 629 A.2d at 698.

We shall affirm the finding of guilty, as confessed, to murder in the first degree.

## II

■ Throughout the sentencing proceeding before the jury Lovell's hands and feet were shackled, over his objection. "The trial judge has broad discretion in maintaining courtroom

security." *Whittlesey v. State,* 340 Md. 30, 84, 665 A.2d 223, 249 (1995), *cert. denied,* —— U.S. ——, 116 S.Ct. 1021, 134 L.Ed.2d 100 (1996). The exercise of that discretion "may not be delegated to courtroom security personnel." *Id.* at 84, 665 A.2d at 250. Further, a defendant in a capital sentencing "is entitled to an *individualized* evaluation of both the need for shackling and the potential prejudice therefrom." *Id.* at 85, 665 A.2d at 250 (emphasis added). In the instant matter the trial court's justification for shackling was not based on the required individualized evaluation. We explain.

A

"Numerous cases have recognized that as a general rule, an accused has a right to be tried [on the issue of guilty or not guilty] without being shackled, chained, bound, handcuffed, gagged, or otherwise physically restrained." S.R. Shapiro, Annotation, *Propriety and Prejudicial Effect of Gagging, Shackling, or Otherwise Physically Restraining Accused During Course of State Criminal Trial,* 90 A.L.R.3d 17, 23 (1979). The limitation on the trial court's discretion with respect to courtroom security is derived from the Due Process Clause. *See Whittlesey,* 340 Md. at 85, 665 A.2d at 250; *see also Estelle v. Williams,* 425 U.S. 501, 96 S.Ct. 1691, 48 L.Ed.2d 126 (1976) (compelling an accused to stand trial before a jury while dressed in identifiable prison clothes violates due process); *Illinois v. Allen,* 397 U.S. 337, 344, 90 S.Ct. 1057, 1061, 25 L.Ed.2d 353, 359 (1970) (binding and gagging the accused, as contrasted with removal from the courtroom, "might possibly be the fairest and most reasonable way to handle a defendant" who is repeatedly disruptive). In a case involving the addition of four uniformed police officers to the customary courtroom security force for the joint trial of six persons charged with armed robbery, the Supreme Court referred to *Estelle* and *Allen* as presenting "close scrutiny of inherently prejudicial practices." *Holbrook v. Flynn,* 475 U.S. 560, 568, 106 S.Ct. 1340, 1345, 89 L.Ed.2d 525, 534 (1986).

Maryland law recognizes that the prejudice to a defendant that can arise from shackling extends to the sentencing phase of a capital case where sentencing is by a jury. One of the

mitigating factors to be considered by the jury in a capital sentencing is that "[i]t is unlikely that the defendant will engage in further criminal activity that would constitute a continuing threat to society." Art. 27, § 413(g)(7). Presenting the defendant in shackles before a sentencing jury impacts adversely on the defendant, particularly as to the possibility of the jury's finding the quoted mitigating circumstance. Expressing the same concept, the Supreme Court of Pennsylvania has said: "Viewing the defendant in handcuffs and shackles during the penalty phase could have the effect of creating in the minds of the jurors the presumption that the defendant is dangerous and therefore worthy of the death sentence." *Commonwealth v. Chester*, 526 Pa. 578, 587 A.2d 1367, 1378–79, *cert. denied sub nom. Laird v. Pennsylvania*, 502 U.S. 849, 112 S.Ct. 152, 116 L.Ed.2d 117, *and cert. denied sub nom. Chester v. Pennsylvania*, 502 U.S. 959, 112 S.Ct. 422, 116 L.Ed.2d 442 (1991).

Consequently, in *Hunt v. State*, 321 Md. 387, 583 A.2d 218 (1990), *cert. denied*, 502 U.S. 835, 112 S.Ct. 117, 116 L.Ed.2d 86 (1991), Judge Chasanow, speaking for the Court, set forth the analysis for reviewing whether a convicted murderer may be shackled at a jury sentencing:

"We must determine whether there was an essential state interest in ordering this appellant to wear leg irons during his sentencing hearing and whether, weighed against the state interest, the order posed an unacceptable risk of prejudice. The prejudice posed by security measures, and whether a compelling state interest outweighs that prejudice, must be measured on a case by case basis.

"There are three essential state interests which may justify physically restraining a defendant: Preventing the defendant's escape, protecting those in the courtroom, and maintaining order in the courtroom. Unless one or more of these factors outweigh any prejudice to the defendant, physical restraint is inappropriate."

*Id.* at 409–10, 583 A.2d at 229 (citation omitted).

Hunt had murdered a uniformed police officer in order to escape apprehension, and Hunt had fled. *Id.* at 401–02, 583

A.2d at 224–25. If those facts alone were sufficient to justify the leg irons that restrained Hunt during his sentencing before a jury, then there would have been no necessity for this Court to review the further facts in the *Hunt* record that supported that physical restraint. Nevertheless, we pointed out that Hunt, prior to committing the murder, had been convicted of armed robbery and assault. *Id.* at 411 n. 4, 583 A.2d at 229 n. 4. While confined following his apprehension on the murder charge and prior to the resentencing that is the subject of the reported case, Hunt had "feigned an illness so that he would be sent to the hospital to 'see what my chances were for freedom.'" *Id.* at 410, 583 A.2d at 229. On two separate occasions during that same confinement, Hunt was caught possessing a knife. *Id.* at 410 & n. 3, 583 A.2d at 229 & n. 3. These and other prison rules violations resulted in "continuous confinement to segregated quarters." *Id.* at 410, 583 A.2d at 229. Thus, the trial court record in *Hunt* presented an individualized evaluation under which the State interest in preventing the demonstrated risk of escape outweighed the prejudice in shackling Hunt's legs.

The same kind of individualized evaluation was performed in *Bowers v. State*, 306 Md. 120, 507 A.2d 1072, *cert. denied*, 479 U.S. 890, 107 S.Ct. 292, 93 L.Ed.2d 265 (1986). Bowers was restrained by leg irons or cuffs during his resentencing before a jury for capital murder in the course of a robbery. *Id.* at 123, 507 A.2d at 1073. This Court upheld the circuit court's exercise of discretion after reviewing Bowers's record. *Id.* at 138, 507 A.2d at 1081. As a juvenile he had been convicted of assault and battery with a knife. *Id.* at 125, 507 A.2d at 1074. He had also been convicted of a kidnapping that arose out of the murder. *Id.* During his confinement on the murder charge he and other prisoners were involved in a disturbance that was quelled only after town police and the Maryland State Police reinforced the jail guards. *Id.* at 126, 507 A.2d at 1074–75. Bowers also had battered a fellow inmate and a jail employee, resulting in his transfer from a county jail to the state prison system where he was placed in solitary confinement. *Id.* at 126, 507 A.2d at 1075.

Most recently, in *Whittlesey v. State*, 340 Md. 30, 665 A.2d 223 (1995), *cert. denied*, —— U.S. ——, 116 S.Ct. 1021, 134 L.Ed.2d 100 (1996), decided nine months before the jury sentencing of Lovell, a convicted murderer claimed error in having been required to appear in leg shackles at his sentencing proceeding before the jury that imposed death. *Id.* at 40, 665 A.2d at 227. Because a resentencing was required on other grounds, it was unnecessary for us to determine in that case whether the shackling was erroneous. *Id.* at 83–84, 665 A.2d at 249. The trial court record indicated that the only support for shackling appeared on an envelope that a representative of the Department of Corrections had given the trial judge on which a block had been checked " 'yes, escape risk history.' " *Id.* at 84, 665 A.2d at 249. "[W]e urge[d] the trial judge [on remand] to follow the directives set out in *Hunt* and *Bowers* before employing any extraordinary security measure and to articulate the reasons underlying any such decision." *Id.* at 86, 665 A.2d at 250.

The decisions of other American courts that address the issue of shackling at a capital sentencing are substantially in accord with the Maryland analysis. The Supreme Court of Florida addressed the problem in *Bello v. State*, 547 So.2d 914 (Fla.1989), on facts remarkably similar to those in the case before us. In order to avoid apprehension in a drug raid, Bello had shot and killed a police officer and attempted to murder another police officer during a gun battle. *Id.* at 915. The Florida court held that the finding of guilty of capital murder "does not mean that no inquiry into the reasons behind the shackling is required in the penalty phase." *Id.* at 918. There was no evidence in the record in *Bello* to support the need for shackling because the trial judge had made no inquiry into its necessity. *Id.* Accordingly, the Supreme Court of Florida vacated the sentence and directed a new sentencing. *Id.* at 919.

A panel of the United States Court of Appeals for the Eleventh Circuit divided on the application of the principles concerning shackling at a capital sentencing in *Elledge v. Dugger*, 823 F.2d 1439 (11th Cir.) (per curiam), *modified on*

*other grounds per curiam,* 833 F.2d 250 (11th Cir.1987), *cert. denied,* 485 U.S. 1014, 108 S.Ct. 1487, 99 L.Ed.2d 715 (1988), a federal habeas corpus case. A Florida state trial judge had authorized shackling after hearing evidence that the murderer, Elledge, had stated, while incarcerated, that he intended to assault the courtroom bailiff because Elledge had nothing to lose. *Id.* at 1450. Further, Elledge had become proficient at karate while in jail. *Id.* A majority of the Eleventh Circuit panel concluded that Elledge should have been given an opportunity to rebut the information furnished to the state judge and that there was an absence of a showing that the shackling was necessary. *Id.* at 1451–52. The dissenting judge considered that the majority had adopted a per se rule. *Id.* at 1452 (Edmondson, J., dissenting). Under the dissenter's approach the trial judge had shackled the defendant "for specific, articulable reasons, in addition to the defendant's status as a felon convicted of a violent murder," and the trial judge had entered those reasons in the record. *Id.* at 1456–57 n. 7. In the absence of a request for a hearing by the defendant, due process was satisfied in the dissenter's view. *Id.* We do not embrace the "per se" rule of the majority in *Elledge.* The position of the dissent, however, is very close to the *Bowers, Hunt,* and *Whittlesey* analysis.

Also similar to the Maryland approach is that of the Supreme Court of Utah in *State v. Young,* 853 P.2d 327 (Utah 1993). After concluding that "safety measures may include shackling a defendant in appropriate circumstances," *id.* at 350, the court stated:

"By holding that shackling at the penalty phase does not inherently violate the due process rights of a defendant, we do not hold that shackling is necessary or appropriate in all capital sentencing proceedings. The mere fact that a jury convicted a defendant of first degree murder is not a sufficient basis for a decision to shackle him during the penalty phase. The trial court should look at the particular facts of the case and the conduct of the proceedings and should balance the need for safety and security in the courtroom against the potential for prejudice."

*Id.* at 350–51. In *Young,* shackling was justified by the defendant's record of violence and uncontrollable temper. *Id.* at 351. When Young became angry at a photographer in an Indiana courtroom, four officers were needed to restrain him. *Id.* In addition, Young's own expert testified "that his temper was triggered when he perceived that he was being labeled retarded or insane," the type of testimony which was to be presented in the penalty phase of Young's trial. *Id.*

The rule in the United States Court of Appeals for the Fifth Circuit has been expressed as follows: "Simply put, a defendant must not be shackled before his jury unless the restraint is necessary to protect the safety of the trial participants or the sanctity of the trial itself." *Marquez v. Collins,* 11 F.3d 1241, 1244 (5th Cir.), *cert. denied sub nom. Marquez v. Scott,* 513 U.S. 881, 115 S.Ct. 215, 130 L.Ed.2d 143 (1994). *Marquez* was an appeal from the denial by a federal district court of a writ of habeas corpus sought by a Texas prisoner who was under a death sentence. *Id.* at 1243. The Texas trial judge had ordered the defendant to be shackled hand and foot after hearing the following evidence:

"(i) Marquez pleaded guilty on January 11, 1984 to four separate indictments for burglary and an earlier theft in 1977; (ii) defendant fled police in an automobile and exchanged gunfire with the pursuing police while going the wrong way on a major thoroughfare at speeds up to 100 mph; (iii) as a juvenile Marquez was charged with 'robbery by assault, strongarm, ungovernable, unlawfully carrying a knife, paint sniffing and burglary of a nonhabitation'; (iv) he had that morning assaulted television cameramen in the hallway while wearing leg braces; and (v) he said he was going to run and the bailiffs would have to shoot him."

*Id.* at 1247.

Illustrations of circumstances justifying shackling at a capital sentencing are presented in the following cases: *Caro v. Vasquez,* No. C93–4159JW, 1996 WL 478683 (N.D.Cal.Aug.19, 1996) (three escape attempts; restraints progressed from knee brace to leg shackles to handcuffing the prisoner's left

hand to his chair at the trial table); *Jefferson v. State,* 328 Ark. 23, 941 S.W.2d 404 (1997) (defendant had disrupted closing arguments in the guilt phase); *Stewart v. State,* 549 So.2d 171 (Fla.1989) (defendant also facing charges of escape and attempted escape), *cert. denied,* 497 U.S. 1032, 110 S.Ct. 3294, 111 L.Ed.2d 802 (1990); *Moon v. State,* 258 Ga. 748, 755, 375 S.E.2d 442, 449 (1988) (court acted on unrefuted information relating to the defendant's having "misbehaved the evening of the first day of the penalty phase of the trial"), *cert. denied,* 499 U.S. 982, 111 S.Ct. 1638, 113 L.Ed.2d 733 (1991); *Commonwealth v. Brown,* 538 Pa. 410, 435, 648 A.2d 1177, 1189 (1994) (defendant was placed in leg irons, which the jury probably did not see, only during the instructions at the penalty phase after defendant "had refused to obey an order of the sheriff and attempted to take control"); *Stockton v. Commonwealth,* 241 Va. 192, 402 S.E.2d 196 (defendant had a propensity for violent crime and a record of escape), *cert. denied,* 502 U.S. 902, 112 S.Ct. 280, 116 L.Ed.2d 231 (1991).

The Supreme Court of Nevada has held that a trial court's decision to shackle at a capital sentencing is sufficiently supported by the verdict of guilty of murder and the request for a death penalty. *See Canape v. State,* 109 Nev. 864, 859 P.2d 1023 (1993), *cert. denied,* 513 U.S. 862, 115 S.Ct. 176, 130 L.Ed.2d 112 (1994); *Duckett v. State,* 104 Nev. 6, 752 P.2d 752 (1988) (per curiam). *Compare Powell v. State,* 108 Nev. 700, 838 P.2d 921 (1992) (per curiam) (threats to take bailiff's eye and to show the court violence if "they" wanted to see violence), *vacated on other grounds,* 511 U.S. 79, 114 S.Ct. 1280, 128 L.Ed.2d 1 (1994). *Duckett* was considered by this Court in *Hunt,* 321 Md. at 407, 583 A.2d at 228, but, as reviewed above, we did not rest our approval of the exercise of discretion to shackle Hunt substantially on the fact that Hunt had murdered a police officer to avoid apprehension.

## B

In the instant matter, after he had pled guilty, Lovell by a written motion requested a court ruling that he appear at sentencing without shackles or other visible, physical re-

straints. In its written response, the State simply asked the court to "hold a hearing to make an individual determination in this matter." Lovell's motion was heard on June 24, 1996, the day on which Lovell elected sentencing by a jury. At the hearing Lovell relied on *Hunt* and *Whittlesey* while the State presented no evidence or argument.

At that hearing Lovell was restrained by a cuff on each ankle between which ran a chain, and he was handcuffed in front by standard handcuffs which brought his right and left wrists to within about three inches of each other. The court denied the motion to unshackle at jury sentencing. Lovell then requested that the court permit removal of the handcuffs only, but the court denied that modification as well.

The circuit court's entire ruling on shackling is reproduced in the margin.[3] In essence, the court concluded "that any

---

3. The circuit court ruled as follows:

"The prospective jury panel in this case and therefore the ultimate jury in this case will be told at the outset that the Defendant has entered pleas of guilty and has been found guilty as confessed to the offense of murder in the first degree. They will also be told that one of the possible penalties of that is Death, one possible penalty is life without parole and one possible penalty is life. The Court feels that any prejudice that might occasion to the Defendant by wearing shackles would be removed by the jury's knowledge of those facts. And that the jury would probably consider it more unusual and noteworthy that the Defendant did not have shackles than they would that the Defendant did have shackles given his situation at this moment. In addition to the decorum of the Courtroom and to the threat of escape and the threat of harm to others, there's also the threat of harm to the Defendant himself. The Court is concerned about any disruption it would disqualify the jury of course. I'm not particularly concerned about any disruption that would dent the decorum of the Court. The Court is decorous that we can resurrect our reputation. But I am concerned about Mr. Lovell as well as anyone else in the Courtroom, should he succumb to any temptation to attempt to leave his assigned seat and to move elsewhere. As he and we can see there are several uniformed officers in close proximity, there are other plain clothed officers throughout the Courtroom. So I'm not concerned that Mr. Lovell might succeed in any attempt to escape. I'm more concerned that he might fail totally and that he might be injured in that failure. For these reasons and because the Court finds that the danger of such injury to Mr. Lovell and to others in the Courtroom, exceeds any possible prejudice it might occasion to Mr. Lovell by the presence of the shackles, the Court will deny the

prejudice that might occasion to the Defendant by wearing shackles would be removed by the jury's knowledge" that Lovell had pled guilty and that he faced a possible death sentence. With respect to the State interests involved, the court disclaimed concern over courtroom decorum. The circuit court was also not concerned that there would be a successful escape. It noted, "there are several uniformed officers in close proximity, there are other plain clothed officers throughout the Courtroom." The court based its ruling on concern over the possibility of injury to persons other than Lovell, and on injuries to Lovell, should he attempt an escape.

We find nothing in the record to suggest that Lovell needed to be protected from provoking an incident, *i.e.,* that the law enforcement officers who were providing courtroom security were looking for a false move from Lovell in order to inflict summary punishment on this admitted cop killer. Indeed, at the conclusion of arguments and after the jury had retired to deliberate, defense counsel addressed the court on behalf of Lovell and himself "to acknowledge the professionalism, the decency of the State Troopers who have dealt with us and our client, and the other staff who have been involved in the investigation of this case."

Lovell stands five feet ten inches tall and weighed 130 pounds at or about the time of sentencing. Prior to any court appearances during the period following Lovell's conviction for capital murder, the custodial authorities would thoroughly

---

Motion to have Mr. Lovell appear without shackles during his sentencing phase of the proceeding. I would add to that the fact that we have been here now for some two hours and fifteen minutes and the Court, because it was intent on the Statements of Counsel and testimony of witnesses, has not until this moment noticed that Mr. Lovell was currently wearing shackles. It's not something that jumps out at one. It is visible if one looks for it, and it will be seen by the jury. But the Court does not feel that that will occasion Mr. Lovell any prejudice because of his wearing those shackles. Should Counsel wish to have an instruction to the jury the Court will give the jury an instruction as to the fact that they should not consider that as any evidence of any wrongdoing on Mr. Lovell's part. That's a matter for Counsel to decide as a trial tactic and I will abide by Counsel's decision and request in that area."

search him for any weapons. There were "several" uniformed officers as well as plain clothed officers furnishing security in the courtroom. There is no indication that an adequate number of officers was not available to control Lovell and to protect trial participants and spectators. *Compare Dixon v. State*, 27 Md.App. 443, 450–51, 340 A.2d 396, 401 (1975) (strike by personnel at the Baltimore City Jail coupled with the defendant's threat to punch a sheriff if the defendant were touched justified handcuffs at trial on guilt or innocence for armed robbery and rape). Lovell had no prior conviction for a crime of violence.[4] There is no indication in the record that he created any disturbance or made any threats from the time of his apprehension to and through the sentencing proceeding. Lovell was twenty-five years of age when this sentencing was conducted. For most of the period from age seventeen he had been confined in correctional institutions for selling controlled dangerous substances. Summaries of his institutional histories were part of the record at sentencing, and they do not reflect any institutional infractions of a violent nature.

Consequently, the decision to require Lovell to appear before the jury at the capital sentencing, shackled hand and foot, rests entirely on his having committed murder, attempted murder, and batteries while armed. Murder is intrinsically a most violent crime, but, if that alone justified shackling at a capital sentencing, then all murderers could be shackled when sentenced by a jury. That is not the way in which the Due Process Clause is applied, as demonstrated in Part II.A hereof. Consequently, we hold that the circuit court erred in failing to base its decision to shackle on an individualized evaluation of whether the State interest in the protection of persons in the courtroom outweighed the prejudice to Lovell.

On June 25, 1996, the potential jurors assembled in the courtroom. The court instructed Lovell to stand briefly before the venire in order to determine which, if any of the

---

4. In August of 1991, at age twenty, Lovell was convicted in New Jersey of possession of a .44 revolver for which he was placed on unsupervised probation for two years.

venirepersons, might know Lovell. When additional venire-persons assembled in the courtroom on June 26, 1996, Lovell was again instructed to stand briefly for identification purposes. Individual *voir dire* was conducted in the judge's chambers. Although the record is silent, we assume Lovell was present, as he had a right to be. *See Bedford v. State,* 317 Md. 659, 670, 566 A.2d 111, 116 (1989); Maryland Rule 4–231. During the one and one-half day sentencing proceeding Lovell sat at the defense trial table. He did not testify under oath and subject to cross-examination, but he did allocute prior to the arguments by the State and defense. For purposes of that allocution, the defense obtained the court's permission to have Lovell seated in the witness chair before the jury returned to the courtroom from a recess. At the conclusion of the allocution the court offered to send the jury out before Lovell moved back from the witness chair to the trial table. Defense counsel said there was no need to do so.[5]

On its own initiative, but without objection from Lovell, the circuit court included in its instructions to the jury the statement that the wrist and ankle shackling was "the normal proceeding for anyone already convicted of charges of murder and facing a serious sentence."[6] We do not believe that this instruction cures the error by causing the balance to tip sufficiently away from prejudice and in favor of the State interest in courtroom security to sustain the decision to shackle. It has been reported that in 1996 there were 3,061 inmates on death row in the United States. *See* NAACP/Legal De-

---

5. In making this tactical decision defense counsel may have concluded that the risk of antagonizing the jury outweighed any benefit, inasmuch as Lovell had been shackled for two to three days in the presence of the persons who comprised the jury.

6. The entire instruction on this subject reads:

"The Defendant, Ivan Lovell, has appeared before you during this proceeding with handcuffs and leg irons. I advise you that this is the normal proceeding for anyone already convicted of charges of murder and facing a serious sentence. You are to draw no conclusions regarding future dangerousness or any other conclusions based upon these normal security measures."

fense & Education Fund, *Death Row, U.S.A.* 1 (Winter 1996). When one considers that cases in which capital punishment has been imposed are intensively (and repetitively) litigated, the relative paucity of reported decisions reviewing a trial court's decision to shackle at a jury capital sentencing, *see* Part II.A, *supra,* suggests that shackling is not the norm.

In *Bruce v. State,* 318 Md. 706, 569 A.2d 1254 (1990), the murderer was not shackled at sentencing despite his having been convicted of five counts of murder committed in a drug-war, mass assassination perpetrated by the defendant and others. *Id.* at 711–13, 569 A.2d at 1257–58. The defendant was found to be a principal in the first degree as to two of the murders, and the jury imposed a death sentence for each of those murders. *Id.* at 712, 569 A.2d at 1257. On appeal Bruce complained about increased security measures that had been taken principally outside of the courtroom, but we said that these measures were not "an inherently prejudicial practice like shackling during trial, which can only be justified by compelling state interests in the specific case." *Id.* at 721, 569 A.2d at 1262.

More important is that the "curative" instruction embodies the error that underlies the decision to shackle in the first instance. The instruction reflects the notion that all convicted murderers who face the possibility of a jury-imposed capital sentence are appropriately shackled. That is not the individualized evaluation that is required by our cases. That individualized evaluation considers whether there is a State interest that justifies the prejudice to the person whom the State seeks to execute. If the prejudice effectively could be eliminated by instructing the jury not to consider the shackling as indicative of future dangerousness, the procedure in all of these cases would be simply to shackle and to instruct, without the need for a hearing.

## III

Lovell contends that there was insufficient evidence to submit to the jury the aggravating circumstance set forth in Article 27, § 413(d)(3), which reads:

"The defendant committed the murder in furtherance of an escape or an attempt to escape from or evade the lawful custody, arrest, or detention of or by an officer or guard of a correctional institution or by a law enforcement officer[.]"

The argument focuses on the words, "custody, arrest, or detention." There is no evidence that Lovell was in custody when he murdered Tfc. Plank. Additionally, submits Lovell, there was not sufficient evidence that he was "about to be arrested, there being no evidence that the officers had probable cause to arrest appellant." Brief of Appellant at 32. Lovell, however, implicitly recognizes that Tfc. Plank was at least attempting to "detain" him, in the Fourth Amendment sense of detention, but Lovell submits that "detention" in § 413(d)(3) has the same meaning as being "legally detained" has in the escape statute, Article 27, § 139. The latter statute provides, in pertinent part:

"(a)(1) If any individual who is legally detained in the State penitentiary or a jail, house of correction, reformatory, station house, or other place of confinement in this State or who is committed to the Alcohol and Drug Abuse Administration for examination or inpatient treatment escapes, the individual is guilty of a felony...."

In order to decide the issue before us, it is unnecessary to articulate the full reach of § 413(d)(3). It is sufficient to rule that the section is not as narrow as Lovell contends. We pointed out in *Calhoun v. State*, 297 Md. 563, 468 A.2d 45 (1983), *cert. denied sub nom. Tichnell v. Maryland*, 466 U.S. 993, 104 S.Ct. 2374, 80 L.Ed.2d 846 (1984), that, under § 413(d)(3), the victim of the murder need not be a police officer. *Id.* at 591, 468 A.2d at 57. The victim of the murder committed in furtherance of the objectives enumerated in § 413(d)(3) could be a civilian. *Id.* Further, the § 413(d)(3) aggravating factor was applied in *Calhoun* where a police officer was killed by a gunshot wound to the head when, in response to an alarm, he entered a retail store office while an armed robbery was in progress. *Id.* at 572–73, 468 A.2d at 48–49. The facts in *Calhoun* belie the notion that the deten-

tion embraced by § 413(d)(3) must be a custody of the person of the murderer that is effected before the murder.

■■■■■■■■ Clearly, the scope of subsection (d)(3) exceeds a murder committed "at a time when [the defendant] was confined in any correctional institution," because that is an aggravating circumstance under subsection (d)(2). It is also clear from the text of § 413(d)(3) that it embraces pre-arrest detentions. The section presents three levels of restraint in descending degrees of duration—"lawful custody, arrest, or detention." The statute applies when any of those degrees of restraint has been accomplished and the murder is "in furtherance of an escape or an attempt to escape" from any of those degrees of restraint. In addition, the statute applies when the murder is "in furtherance of . . . *an attempt to . . . evade . . .* lawful custody, arrest, or detention . . . by a law enforcement officer." (Emphasis added). In the instant matter Tfc. Plank had probable cause to arrest Lovell, as we explain below, but that is not the critical inquiry. The critical inquiry is the purpose underlying the defendant's commission of the murder. Consequently, the jury need not find beyond a reasonable doubt that Tfc. Plank had formed the intent to place Lovell under arrest. The evidence was sufficient for the jury to find beyond a reasonable doubt that, from Lovell's point of view, he committed the murder "in furtherance of . . . an attempt to . . . evade . . . lawful . . . detention . . . by a law enforcement officer."

■■■■ Maryland Code (1977, 1992 Repl.Vol.), § 26–202(a) of the Transportation Article authorizes

"[a] police officer [to] arrest without a warrant a person for a violation of the Maryland Vehicle Law . . . if:

. . . .

"(2) The person has committed or is committing the violation within the view or presence of the officer, and . . . .

"(i) The person does not furnish satisfactory evidence of identity[.]"

Here Tfc. Plank had completed Maryland Uniform Complaints and Citations charging violations of §§ 21–801.1 (exceeding maximum speed) and 16–112(c) (failure to display license on demand) of the Motor Vehicle Law. Lovell did not produce a form of identification that enjoyed any official sponsorship by the federal or a state government. The employee identification card he did produce contained no home address, and thus, did not corroborate the home address in Elizabeth City, North Carolina that "Billups" gave to Tfc. Plank. The circumstances are elevated from mere suspicion to probable cause of a violation of § 26–202(a)(2)(i) of the Transportation Article by Lovell's having first written a name other than Charles Edward Billups, Jr. on the receipt for the citations and by his then having overwritten the name conforming to that on the employee identification card.

In any event, the following facts support a finding that Lovell killed in furtherance of an attempt to evade detention. Lovell knew that he had in his possession a .45 handgun and a large quantity of cocaine. Lovell also saw the backup police vehicle arrive, and he saw Trooper Lord and Tfc. Plank converse. It was perfectly apparent to Lovell that he was going to be further detained. There was sufficient evidence from which the jury could find beyond a reasonable doubt that, because Lovell could not risk any further inquiry into his identity, or a search of himself, or of the vehicle, he committed murder.

## IV

One of the mitigating circumstances set forth in Maryland's death penalty statute is "[t]he youthful age of the defendant at the time of the crime." Art. 27, § 413(g)(5). Lovell argues that the circuit court abused its discretion in failing to give a supplemental instruction explaining that mitigating circumstance. The contention is based upon the facts set forth below.

In the portion of its charge that reviewed the mitigating circumstances listed in § 413(g), the circuit court said simply:

"Mitigating circumstance number 5 is the youthful age of the Defendant at the time [of] the crime." Lovell did not except to that instruction.

The jury began deliberations at 3:44 p.m. and, shortly before 8:00 p.m. that same day, it sent the following note to the trial judge:

"Section III [of the verdict form], number 5 uses the term 'youthful age'.

"The jury wants to know if there is any further definition for this term or guidance the court can give the jury, relative to this term."

In discussing the note with counsel, the court said:

"There are, I would suggest, at least two possible answers. The first and most tempting is no. If one overcomes the temptation to just say no, then one might look to the case of Johnson v. State at 303 Md. 487 [495 A.2d 1], a somewhat old case, a 1985 case. That stated that in effect youthful age, the mitigating factor of youthful age is not measured by a chronological standard, but rather a prior criminal conduct, home environment, marital status, degree of maturity, alcohol and drug abuse among others are all factors relevant to the concept of youthful age. I will hear from counsel.... [W]hat would the State's request be for the Court to respond to the jury in the answer to their question[?]

. . . .

"[THE STATE]: We would prefer your first answer.

"THE COURT: Okay.

"[DEFENSE COUNSEL]: Your Honor, *in addition to* the language you found in Johnson, there is another piece of law that speaks *as well*."

(Emphasis added). Defense counsel referred to the fact that the legislature had amended the statute to exclude from consideration for the death penalty anyone under the age of eighteen at the time the murder was committed. Art. 27, § 412(g). Thus, defense counsel submitted, the jury should

also be told that "youthful age" applied only to persons eighteen and older. The trial judge expressed the view that that might confuse the jury and rejected that suggestion. The defense excepted. Thereupon, when the jurors were brought back to the courtroom, the court stated:

"Mr. Foreman, ladies and gentlemen of the jury, we have received your note which says, 'Section III, Number 5, uses the term "youthful age". The jury wants to know if there is any further definition for this term or guidance the Court can give the jury relative to this term.' *Answer to both of your questions is 'No.' There is no further definition to the term and there is no further guidance that the Court can give the jury relative to the term.* Having completely answered your question, Mr. Foreman, you and the jury are excused to return to your jury room to continue your deliberations."

(Emphasis added). At 9:32 p.m. the jury returned a sentence of death finding, *inter alia,* that the mitigating factor of youthful age did not apply.

Youthful age has been listed as a potential mitigating circumstance since the enactment of a channelized-discretion, capital punishment statute by Chapter 3 of the Acts of 1978. At that time the statute contained no prohibition against capital punishment based on a fixed minimum age of the murderer at the time of the crime. In *Stebbing v. State,* 299 Md. 331, 473 A.2d 903, *cert. denied,* 469 U.S. 900, 105 S.Ct. 276, 83 L.Ed.2d 212 (1984), we said flatly "that the mitigating circumstance of youthful age is not measured solely by chronological age." *Id.* at 367, 473 A.2d at 921. We pointed out that in enacting the 1978 statute the General Assembly rejected an amendment that would have established a minimum age of eighteen at the time of the murder for imposition of the death penalty and also an amendment that would have defined "youthful age" to be twenty-five years or younger. *Id.* at 367 n. 9, 473 A.2d at 921 n. 9. We also quoted with approval from *Neal v. State,* 261 Ark. 336, 548 S.W.2d 135, *cert. denied,* 434 U.S. 878, 98 S.Ct. 231, 54 L.Ed.2d 158 (1977), to the effect that " 'youth,' in its ordinary meaning, 'is equated with juvenility

and adolescence; it seems to reach its outer limits at maturity.' " *Stebbing,* 299 Md. at 368, 473 A.2d at 921 (quoting *Neal,* 548 S.W.2d at 139). In *Stebbing* we held that the sentencing judge was not compelled to find the mitigating circumstance of youthful age, under all of the circumstances, where the defendant was nineteen years of age at the time of the murder. *Id.* at 368–69, 473 A.2d at 922.

*White v. State,* 300 Md. 719, 481 A.2d 201 (1984), *cert. denied,* 470 U.S. 1062, 105 S.Ct. 1779, 84 L.Ed.2d 837 (1985), summarized the circumstances considered in *Stebbing* as "prior criminal conduct, home environment, marital status, degree of maturity, and alcohol and drug abuse, among others." *Id.* at 738, 481 A.2d at 210. In *White* we rejected the contention that no rational jury could have failed to find youthful age as a mitigating factor, where the defendant was age eighteen at the time of the murder. *Id.* at 739, 481 A.2d at 211.

In *Trimble v. State,* 300 Md. 387, 478 A.2d 1143 (1984), *cert. denied,* 469 U.S. 1230, 105 S.Ct. 1231, 84 L.Ed.2d 368 (1985), we held that the defendant's age at the time of the murder, seventeen years and eight months, did "not engage the Eighth Amendment as a shield to capital punishment." *Id.* at 428, 478 A.2d at 1164. *Johnson v. State,* 303 Md. 487, 495 A.2d 1 (1985), *cert. denied,* 474 U.S. 1093, 106 S.Ct. 868, 88 L.Ed.2d 907 (1986), referred to by the trial court in considering the response to the jury's question in the instant matter, dealt with a defendant who was seventeen years and ten months at the time of the murder. *Id.* at 522, 495 A.2d at 19. Based upon the aforementioned cases we held that the trial court in *Johnson* did not err in declining to instruct the jury that it must find youthful age. *Id.* at 523, 495 A.2d at 19.

Apparently as a response to the *Trimble* and *Johnson* cases, the General Assembly amended the death penalty statute to provide that "[i]f a person found guilty of murder in the first degree was less than 18 years old at the time the murder was committed, the person shall be sentenced to imprisonment for life and may not be sentenced to death." Chapter 626 of

the Acts of 1987, now codified as Article 27, § 412(g)(1).[7] As introduced, the legislative bill that became Chapter 626 would have prohibited the execution of a person who was younger than sixteen years at the time the murder was committed, but the bill was amended to raise the threshold age to eighteen. 1987 Md. Laws at 2908. When it provided that a murderer must be age eighteen at the time of the crime in order to be death eligible, the General Assembly did not amend the mitigating circumstance of youthful age. Against this background we have no difficulty in understanding Lovell's counsel to have requested the trial court not only to answer the jury's inquiry by instructing on the factors to be considered in determining youthful age, as set forth in *Johnson* and its predecessor cases, but also to instruct that those factors be considered in relation to the absolute floor established by the prohibition against executing a person who was less than eighteen years of age at the time of the murder. Accordingly, we reject the State's contention that there has been a lack of preservation for appellate review.

 Whether to give a jury supplemental instructions in a criminal cause is within the discretion of the trial judge. *See* Maryland Rule 4–325(a) ("The court shall give instructions to the jury at the conclusion of all the evidence and before closing arguments and may supplement them at a later time when appropriate."). *Battle v. State,* 287 Md. 675, 414 A.2d 1266 (1980), held it to be reversible error to give a confusing and potentially misleading instruction in response to an ambiguous question asked by the jury. *Id.* at 685, 414 A.2d at 1271. This Court, however, seems never to have been presented with a claim of error based upon a decision not to instruct at all in response to a jury's question concerning a matter that the jury is required to consider.

---

7. Article 27, § 412(g)(1) today also provides that a person who "was, at the time the murder was committed, mentally retarded ... may not be sentenced to death." This change was made by Chapter 677 of the Acts of 1989.

The theme of clarifying confusion on the part of a jury sounds in Justice Frankfurter's opinion for the Supreme Court in *Bollenbach v. United States,* 326 U.S. 607, 66 S.Ct. 402, 90 L.Ed. 350 (1946). Bollenbach, who was apparently a "fence," was convicted of conspiring to transport stolen securities across state lines, knowing them to have been stolen. *Id.* at 608, 66 S.Ct. at 403, 90 L.Ed. at 352. The jury had asked " '[i]f the defendant were aware that bonds which he aided in disposing of were stolen does that knowledge make him guilty on the [conspiracy] count?' " *Id.* at 609, 66 S.Ct. at 403, 90 L.Ed. at 352. The trial court gave a cursory response that included reference to a presumption that the possessor of recently stolen goods is the thief. *Id.* at 609, 66 S.Ct. at 404, 90 L.Ed. at 352–53. Noting that the trial judge's "last word is apt to be the decisive word," the Court said: "If [the last word] is a specific ruling on a vital issue and misleading, the error is not cured by a prior unexceptional and unilluminating abstract charge." *Id.* at 612, 66 S.Ct. at 405, 90 L.Ed. at 354. The Court further said:

> "The jury's questions, and particularly the last written inquiry in reply to which the untenable 'presumption' was given, clearly indicated that the jurors were confused concerning the relation of knowingly disposing of stolen securities after their interstate journey had ended to the charge of conspiring to transport such securities. Discharge of the jury's responsibility for drawing appropriate conclusions from the testimony depended on discharge of the judge's responsibility to give the jury the required guidance by a lucid statement of the relevant legal criteria. When a jury makes explicit its difficulties a trial judge should clear them away with concrete accuracy. In any event, therefore, the trial judge had no business to be 'quite cursory' in the circumstances in which the jury here asked for supplemental instruction. But he was not even 'cursorily' accurate. He was simply wrong."

*Id.* at 612–13, 66 S. Ct at 405, 90 L.Ed. at 354.

A trial court's decision not to respond at all to a question from a deliberating jury was addressed in *Price v. Glosson*

*Motor Lines, Inc.,* 509 F.2d 1033 (4th Cir.1975). In that personal injury case the jury had been instructed that if it was

> " 'uncertain as to whether the plaintiff was guilty of contributory negligence, or if you believe that it is just as probable that the plaintiff was not guilty of any such negligence as it is that he was, then you cannot find the plaintiff guilty of contributory negligence.' "

*Id.* at 1035. The court declined to respond when the jury asked whether it had been instructed " 'that if there be doubt in the minds of the jurors as to the negligence or lack of it on the part of the plaintiff, the jury should find for the plaintiff?' " *Id.* The Fourth Circuit, in reversing a judgment based on a jury verdict in favor of the defendant and remanding for a new trial, reasoned as follows:

> "Concern about confusing or prejudicing the jury by over-instruction is, of course, appropriate. In the present contest, however, the concern is not compelling, because here the jury specified its difficulty and confusion concerning instructions *on the central question in the case.* In the absence of a jury inquiry, the district judge works in something of a vacuum; he can never be sure how well a jury has understood instruction on points of law, complex or simple. When a jury makes a specific difficulty known, however, it is far easier for the judge to be certain that he is responding to difficulties rather than compounding them. And when the difficulty involved is an issue as central to the case as contributory negligence is here, helpful response is mandatory."

*Id.* at 1037 (citation and footnote omitted).

 In the instant matter the jury's question indicated that one or more members of the jury were concerned about the concept of youthful age as a statutory mitigating circumstance. Absent clarification from the trial court, there was a very real risk that the jurors may have erroneously concluded that youthful age is concerned exclusively with the defendant's chronological age, and Lovell was twenty-four years old at the time of the murder. Without having been told that persons

younger than age eighteen at the time of the murder cannot be executed, the jury may well have considered that youthful age was listed in the statute as a mitigating factor to allow for the possibility of a life sentence in cases where the death penalty is sought against a person who was age seventeen, or age sixteen, or possibly even younger when committing the murder. The result may well have been that the jury miscalibrated on the low side the floor or minimum age at which the mitigating factor begins possible operation. Further, the absence of any response by the court to the jury's relevant inquiry created a real risk that the factors bearing on life experience and maturity, which are part of the concept of youthful age, were not considered at all. For these reasons the trial court abused its discretion by not responding to the jury's request for a supplemental instruction.

■ The error is not harmless beyond a reasonable doubt, as required by *Dorsey v. State*, 276 Md. 638, 350 A.2d 665 (1976). One or more jurors were sufficiently concerned over the possible application of the youthful age mitigating factor to a murderer, who was twenty-four years old at the time of the crime, that they sought clarification. Lovell had only a tenth grade education, had no military service, had no work history, was unmarried, and, since age seventeen, had spent the better portion of his life incarcerated. If only one juror was not persuaded that youthful age, coupled with the absence of any conviction for a crime of violence, were outweighed by the aggravating circumstances, the jury could not impose a death sentence.

## V

In view of our holdings in Parts II and IV hereof, it is unnecessary to address Lovell's contentions of error in excusing certain jurors for cause.

## VI

■ Lovell also challenged the array by moving that the proceedings against him be stayed until the system for select-

ing potential jurors in Talbot County conformed to constitutional and statutory requirements. He asserted, *inter alia,* a violation of his Sixth Amendment right to "a jury drawn from a fair cross section of the community," *Taylor v. Louisiana,* 419 U.S. 522, 527, 95 S.Ct. 692, 696, 42 L.Ed.2d 690, 696 (1975), based on an allegedly unfair and systematic underrepresentation of African Americans in Talbot County jury pools. If Lovell's challenge to the Talbot County jury selection plan was well-founded and he was entitled to a stay, that conclusion would impact jury selection for his resentencing. Consequently, this issue is not moot.

Persons to be summoned for jury duty in Talbot County are identified exclusively from the list of registered voters in the county. Through his expert on statistics, Lovell produced evidence based on 1990 census data that 17.6% of the population of Talbot County between the ages of eighteen and sixty-nine are African Americans.[8] The expert had also caused jury qualification questionnaires to be examined for the circuit court's second term of 1994, both terms of 1995, and the first term of 1996. Based primarily on a sample consisting of one-third of those questionnaires, the expert concluded that African Americans constituted 8.3% of the circuit court's arrays over the period studied. In the expert's opinion, these disparities constituted a substantial and statistically significant underrepresentation of African Americans. Lovell's expert further testified that drawing potential jurors from lists compiled from both the voter registration records and records of licensed motor vehicle operators resident in Talbot County would reduce the disparity by more than one-half.

The expert, and the fair cross-section cases, use the term "absolute disparity." It is the difference in percentage points between the ideal representation of a group in the jury pools, utilizing that group's percentage of the total population, and

---

**8.** Census data also reflected that 1.1% of Talbot County residents over the age of eighteen are non-citizens of the United States, 3.4% do not speak English, and 1.7% are institutionalized in a nursing home or in prison. The expert testified that the existence of these groups did not undermine the statistical reliability of his study.

the actual representation of that group in the jury pools, expressed as a percentage. In the instant matter the expert subtracted from the ideal of 17.6% African Americans in the total population, the 8.3% representation in the jury pools to derive an absolute disparity of 9.3 percentage points. The expert and the cases express this as –9.3%.

The expert, and some of the cases, also speak of "comparative disparity." It is a way of expressing the relationship between the theoretically ideal and the actual by stating the difference between the two (*i.e.,* actual disparity) as a percentage of the ideal. In the instant matter the expert testified that the comparative disparity ratio is 52.8, expressed as –52.8%.[9]

The State presented no evidence at the pretrial hearing. The court ruled that use of voter registration lists as the sole source for selection of an array was constitutional and that "under 'absolute disparity' analysis, [there was] no violation of the fair-cross-section requirement."[10]

In his argument to us Lovell's challenge to the array is premised solely on the Sixth Amendment. The Supreme Court held in *Duren v. Missouri,* 439 U.S. 357, 99 S.Ct. 664, 58 L.Ed.2d 579 (1979), that, in order to establish a prima facie violation of the fair cross-section requirement, a defendant must show:

"(1) that the group alleged to be excluded is a 'distinctive' group in the community; (2) that the representation of this group in venires from which juries are selected is not fair and reasonable in relation to the number of such persons in the community; and (3) that this underrepresentation is due

9. The expert testified that comparative disparity is determined by dividing absolute disparity by the percentage representing the ideal and then multiplying the quotient by 100.

10. The circuit court also noted that the venire from which Lovell's jury would be drawn would come from a jury pool for a term of court in which, according to Lovell's expert, the African–American composition was 11.6% and the absolute disparity was –6.0%.

to systematic exclusion of the group in the jury-selection process."

*Id.* at 364, 99 S.Ct. at 668, 58 L.Ed.2d at 586–87.

The first element of the *Duren* test is satisfied by an allegation. Here the group alleged to be underrepresented is African Americans, a "distinctive" group in the *Duren* context.

In this Court Lovell focuses his argument on the second *Duren* element, but he does not rely on the absolute disparity of –9.3%.[11] Lovell seeks to establish the second *Duren* element by comparative disparity. The Circuit Court for Talbot County did not consider comparative disparity because, it said, "controlling Maryland law rejects this mode of analysis," in reliance on *Bailey v. State,* 63 Md.App. 594, 493 A.2d 396, *cert. denied,* 304 Md. 296, 498 A.2d 1183 (1985). Lovell also reads *Bailey* as flatly rejecting comparative analysis, and he urges this Court to overrule that aspect of *Bailey.* Lovell asks that we then adopt comparative disparity as the more meaningful and fairer standard for determining whether there is unlawful underrepresentation.

The argument for comparative disparity begins with an inherent aspect of absolute disparity. If, for example, in the

---

**11.** Bailey v. State, 63 Md.App. 594, 493 A.2d 396, *cert. denied,* 304 Md. 296, 498 A.2d 1183 (1985), had found an absolute disparity of –13.5% insufficient to show unfair and unreasonable underrepresentation. The Court of Special Appeals in *Bailey,* in part, said:

"[T]he absolute disparity has approached 40% in every instance in which the Supreme Court has found a Sixth Amendment fair cross section violation. *See Duren, supra* (39.5%); *Taylor v. Louisiana,* 419 U.S. 522, 95 S.Ct. 692, 42 L.Ed.2d 690 (1975) (43%); *Turner v. Fouche,* 396 U.S. 346, 90 S.Ct. 532, 24 L.Ed.2d 567 (1970) (over 40%); *Casteneda [Castaneda] v. Partida,* 430 U.S. 482, 97 S.Ct. 1272, 51 L.Ed.2d 498 (1977) (40.1%)."

*Id.* at 604, 493 A.2d at 400. Later cases, involving absolute disparities greater than the –9.3% presented here, have held that the proof failed to establish the second *Duren* element for a prima facie case. *See Ramseur v. Beyer,* 983 F.2d 1215 (3d Cir.1992) (14.6%), *cert. denied,* 508 U.S. 947, 113 S.Ct. 2433, 124 L.Ed.2d 653 (1993); *United States v. Grisham,* 63 F.3d 1074 (11th Cir.1995) (under 10%), *cert. denied,* —— U.S. ——, 116 S.Ct. 798, 133 L.Ed.2d 746 (1996); *United States v. Ashley,* 54 F.3d 311 (7th Cir.) (under 10%), *cert. denied,* —— U.S. ——, 116 S.Ct. 232, 133 L.Ed.2d 161 (1995).

instant matter there had never been an African American on a Talbot County array, the absolute disparity would remain fixed, by definition, at –17.6%, but the comparative disparity would be 100%. Thus, if a distinct group that comprised only a small percentage of the total population were systematically excluded, looking only at absolute disparity would not reveal the problem. Lovell's expert testified that comparative disparity was "useful" and the "preferred" analysis for distinct groups comprising anywhere from five or ten percent up to fifty percent of the population. He opined that a comparative disparity in excess of twenty percent was statistically significant, demonstrating "an issue of underrepresentation in the jury pool." Lovell asks us to rule that a comparative disparity in excess of –20% satisfies the second *Duren* element.

■ Whatever merits comparative disparity might have (other than to make a number look larger), they ordinarily concern a disparate group that is a quite small portion of the total population. Here the distinctive group consists of 17.6% of the Talbot County population. *United States v. Maskeny*, 609 F.2d 183 (5th Cir.), *cert. denied*, 447 U.S. 921, 100 S.Ct. 3010, 65 L.Ed.2d 1112 (1980), concluded that there was no occasion to consider a comparative analysis where the distinctive group comprised more than ten percent of the total population. *Id.* at 190. Accordingly, we reject the request to adopt a standard under which a comparative disparity in excess of –20% would establish the second *Duren* element. Further, resolution of these cases tends to generate comparisons of percentages (as this opinion illustrates). We see no benefit in requiring trial judges to double the comparisons in every case by supplementing an absolute disparity analysis with a comparative disparity analysis. Absolute disparity remains the standard. *See Twenty–Fifth Annual Review of Criminal Procedure*, 84 Geo. L.J. 641, 1145 n. 1715 (1996) ("*Duren* and most of the circuits use the 'absolute disparity' test. . . .").

■ By declining to adopt comparative disparity as the standard, and by not requiring trial judges to look to compara-

tive disparity as a supplemental approach in all cases, we do not foreclose circuit courts from supplementing absolute disparity with comparative disparity in cases involving a distinctive group comprising less than ten percent of the total population in the county, if the trial court believes that comparative disparity would be helpful in deciding whether the representation of the distinctive group is fair and reasonable. To the extent that *Bailey v. State,* 63 Md.App. 594, 493 A.2d 396 (1985), can be read as prohibiting a trial court from even considering that which it believes may be helpful, that reading of *Bailey* is disapproved.[12]

Thus, the circuit court did not err in declining to consider comparative disparity here, where the distinctive group comprises 17.6% of the population.

Lovell has produced no direct evidence that the election officials in Talbot County have excluded African Americans from registering to vote, nor will we infer from the percentages developed by Lovell's expert that those officials have deprived African Americans in Talbot County of their civil rights. Lovell's approach in attempting to demonstrate systematic underrepresentation in jury pools in reality faults the voter registration list for failing ideally to mirror the percentage of African Americans in the county's total population. Indeed, Lovell admits that the difference is "caused by exclusive reliance on voter registration lists." Brief of Appellant at 63.

"Voter registration lists are frequently used in jury selection and the practice has been consistently sustained." 3 J.G. Cook, *Constitutional Rights of the Accused* § 17:14, at 83–84 (2d ed.1986). The United States Court of Appeals for the Fourth Circuit addressed *en banc* the issue before us in an appeal from the District of Maryland. *See United States v. Cecil,* 836 F.2d 1431 (4th Cir.), *cert. denied,* 487 U.S. 1205, 108

---

12. Inasmuch as comparative disparity is nothing more than a mathematical calculation based on the same data from which absolute disparity is derived, the comparative disparity percentage would be in every record.

S.Ct. 2846, 101 L.Ed.2d 883 (1988). After a thorough review of its own cases and other authorities, the Fourth Circuit said:

"The authorities cited, from practically every Circuit including our own, in many of which certiorari has consistently been denied by the Supreme Court, as well as the legislative intent expressed in the Jury Selection Act itself, as found by the courts, categorically establish that there is no violation of the jury cross-section requirement where there is merely underrepresentation of a cognizable class by reason of failure to register, when that right is fully open."

*Id.* at 1448. *See also United States v. Ireland,* 62 F.3d 227, 231–32 (8th Cir.1995); *United States v. Lewis,* 10 F.3d 1086, 1089–90 (4th Cir.1993); *Davis v. Warden,* 867 F.2d 1003, 1015 (7th Cir.), *cert. denied sub nom. Davis v. O'Leary,* 493 U.S. 920, 110 S.Ct. 285, 107 L.Ed.2d 264 (1989); *United States v. Osorio,* 801 F.Supp. 966, 977–78 (D.Conn.1992).[13]

■ On the record before us the only persons who are excluded from jury service in Talbot County are those who choose not to register to vote, or who are disqualified from doing so. Those persons are not a "distinctive" or "cognizable" group. *See Wilkins v. State,* 270 Md. 62, 68–69, 310 A.2d 39, 42, *aff'g* 16 Md.App. 587, 300 A.2d 411 (1973), *cert. denied,* 415 U.S. 992, 94 S.Ct. 1592, 39 L.Ed.2d 889 (1974).

FINDING OF GUILTY OF MURDER IN THE FIRST DEGREE, BASED UPON PLEA OF GUILTY, AFFIRMED. DEATH SENTENCE VACATED, AND CAUSE

---

13. The Fourth Circuit in fair cross-section cases also has looked at whether there is gross underrepresentation of the distinctive group in the voter registration list by comparing the percentage of registrants from the distinctive group that is in the jury pool with the percentage of registrants from the majority group that is in the jury pool. *See United States v. Lewis,* 10 F.3d 1086 (4th Cir.1993); *United States v. Cecil,* 836 F.2d 1431 (4th Cir.) (en banc), *cert. denied,* 487 U.S. 1205, 108 S.Ct. 2846, 101 L.Ed.2d 883 (1988). Where the disparity between the two has been less than twenty percentage points, that court has held that the disparity did not require supplementation of the voter registration lists. *See Lewis,* 10 F.3d at 1090; *Cecil,* 836 F.2d at 1452–55. Lovell's expert did not produce the evidence needed to test against the above-described approach.

REMANDED TO THE CIRCUIT COURT FOR TALBOT COUNTY FOR A NEW SENTENCING PROCEEDING UNDER § 413 OF ARTICLE 27.

WILNER, J., files concurring opinion joined by CHASANOW, J.

WILNER, Judge, concurring opinion in which CHASANOW, Judge, joins.

I concur in the result reached by the majority. Lovell is entitled to a new sentencing hearing because the trial court failed to respond appropriately to the jury's question with respect to the mitigating factor of youthful age. Given Lovell's age (24) and the fact that, under our current law, "youthful age," for purposes of the death penalty, essentially starts at 18 rather than at birth, it was important that the court give some guidance to the jury, which obviously desired such guidance. I write separately to express my disagreement with and concern over the majority's view that the sentence would have to be vacated on the additional ground that the court did not make a proper individualized assessment of whether Lovell's shackling was necessary. I believe that the approach taken by the majority on that issue (1) is not required by our case law, and (2) is unnecessary and defies common sense in the context of a capital sentencing hearing.

We first examined this issue, at some length, in *Bowers v. State*, 306 Md. 120, 507 A.2d 1072, *cert. denied*, 479 U.S. 890, 107 S.Ct. 292, 93 L.Ed.2d 265 (1986), which also arose from a death penalty sentencing hearing before a jury. Bowers had kidnapped, sexually assaulted, and murdered a woman. Upon his conviction for first degree premeditated murder, he was sentenced to death, but this Court vacated the sentence because the jury had failed to find a mitigating circumstance that the State conceded was established by the evidence. The shackling issue arose at the new sentencing hearing as the result of a memorandum from the sheriff's office to the courthouse security deputies, directing them to take appropriate steps to protect the defendant and other courtroom at-

tendants and noting that "[t]his may include leg cuffs at all times." The judge informed counsel of that memorandum as well as of his own awareness of "some difficulty" while Bowers was incarcerated. The nature of that "difficulty" was not then explained. Although noting that he might have reached a different conclusion, the judge felt that he ought not "to second guess the individuals charged with security where there has been some prior indication of difficulty involving the Defendant." *Id.* at 124, 507 A.2d at 1074. The court concluded that the sheriff's office was "not being unreasonable or arbitrary in their decision in this instance" and that the court should "not countermand their direction to the court security people." *Id.*

In his sentencing report, filed after the jury returned its verdict imposing the death sentence, the judge recounted Bowers' criminal history and prior institutional experiences. There were no prior crimes of violence. There were incidents of assaults and disturbances while he was incarcerated, although none involved an attempt to escape, and those incidents occurred approximately 10 years earlier. We assumed that the court was aware of them and took them into account when making its decision to allow Bowers to remain in leg irons.

At Bowers' request, the jury was asked on voir dire whether it would be unable to render a fair and impartial verdict because of the leg irons and whether it would draw any inference as to his character from his appearance in leg shackles. One juror responded affirmatively to the latter question and was excused.

We rejected Bowers' complaint that he was entitled, as a matter of due process, to appear without shackles, holding that (1) the judge had discretion in the matter and did not abuse that discretion, and (2) in any event, no prejudice had been shown. The latter ground was based on the voir dire. We said:

"In [cited cases] we have found voir dire adequate to screen out any prejudice caused by pretrial publicity in the area

from which the jury was drawn. If adequate for that, it certainly should be adequate for selection of a jury untainted with prejudice because of a defendant's shackling. Only one juror indicated that shackling would influence him and that juror was excused."

*Bowers,* 306 Md. at 138–39, 507 A.2d at 1081.

The principal discussion in *Bowers* was on the matter of discretion. We noted the long tradition, rooted in English common law, of not having defendants shackled in court, largely because of the presumption of innocence that a defendant enjoys and the fear that shackling or other undue measures (such as requiring the defendant to appear in prison garb) " 'may undermine the fairness of the fact-finding process.' " *Id.* at 131, 507 A.2d at 1077 (quoting from *Estelle v. Williams,* 425 U.S. 501, 503, 96 S.Ct. 1691, 1693, 48 L.Ed.2d 126, 130 (1976)). Citing a plethora of Federal and State cases, we concluded that "[t]he courts uniformly rely upon an abuse of discretion standard for reviewing the action of trial judges in the matter of restraints. . . ." *Id.* at 132, 507 A.2d at 1078. We quoted, in particular, from *United States v. Samuel,* 431 F.2d 610, 615 (4th Cir.1970), *cert. denied,* 401 U.S. 946, 91 S.Ct. 964, 28 L.Ed.2d 229 (1971):

"It is [the trial judge] who is best equipped to decide the extent to which security measures should be adopted to prevent disruption of the trial, harm to those in the courtroom, escape of the accused, and the prevention of other crimes. [citations omitted.] As a discretionary matter, the [trial] judge's decision with regard to measures for security is subject to limited review to determine if it is abused."

Quoting further from *Samuel* and other cases, we noted that, although the judge may consider and rely on the views of those responsible for courtroom security—the marshal or the sheriff—it is the judge's discretion that, in the end, must be exercised; that discretion may not be delegated to the sheriff. Citing numerous cases, we pointed out that, under such a discretionary standard, "[l]eg cuffs, shackling, or other re-

straints have been upheld," even in trial settings. *Bowers, supra* at 135, 507 A.2d at 1079.

In nearly all of those cases, we observed, the issue arose in the context of a determination of guilt or innocence, where the discretion accorded to the judge is limited by the presumption of innocence and the justified concern over the distracting effect of shackles or other restraints. Bowers, we pointed out, as Lovell in this case, was not in that position: "He stands in the position of a convicted felon brought before a trial court for sentencing. He thus is unlike the ordinary defendant who at trial stands clothed with a presumption of innocence." *Id.* at 132, 507 A.2d at 1078. The only case, at the time, dealing with shackling at a capital sentencing hearing was *Elledge v. State,* 408 So.2d 1021 (Fla.1981), *cert. denied,* 459 U.S. 981, 103 S.Ct. 316, 74 L.Ed.2d 293 (1982), and we quoted from that case. The Florida Supreme Court upheld the shackling, on the same two grounds used by us in *Bowers*—lack of prejudice and discretion. As to prejudice, the *Elledge* Court held:

"Cases which concern such prejudice deal with the adverse effects that such restraints have upon the accused's presumption of innocence [citations omitted]. But appellant did not stand before the sentencing jury as an innocent man; rather he stood as a confessed murderer of three persons. The critical issue in a restraint case is the degree of prejudice caused by the restraints. Here, we can find very little prejudice since the appellant was an avowed dangerous individual."

408 So.2d at 1022–23, quoted in *Bowers,* 306 Md. at 136–37, 507 A.2d at 1080.

*Elledge* also found no abuse of discretion, observing that the judge had information that the defendant had threatened to attack his bailiff, although the nature, timing, and circumstances of that threat were not explained.[1]

---

1. *Elledge* had a subsequent history. In *Elledge v. Dugger,* 823 F.2d 1439 (11th Cir.1987), the U.S. Court of Appeals found that the shackling violated Elledge's right to due process of law and directed the District Court to grant habeas corpus and set aside the death sentence. The

Our conclusion in *Bowers*, as to the element of discretion was as follows:

decision was announced in a per curiam opinion concurred in by two judges, over a dissent by Judge Edmondson. Relying on language in *Holbrook v. Flynn*, 475 U.S. 560, 106 S.Ct. 1340, 89 L.Ed.2d 525 (1986) and *Illinois v. Allen*, 397 U.S. 337, 344, 90 S.Ct. 1057, 1061, 25 L.Ed.2d 353 (1970), that shackling is "an inherently prejudicial practice" that is "something of an affront to the very dignity and decorum of judicial proceedings," the two judges concluded that the concern did not stem just from the presumption of innocence and that, therefore, the standards governing shackling at guilt/innocence proceedings applied as well to capital sentencing proceedings. Accordingly, the court required that shackling be subjected to "close judicial scrutiny" to determine if an "essential state interest" was being furthered. 823 F.2d at 1451.

The record in *Elledge* showed that the trial judge acted solely on the basis of a memorandum from the sheriff reciting that Elledge was a karate expert and had threatened to attack the bailiff in, or on the way to, the courtroom, because he had nothing to lose. The judge refused to allow Elledge to respond to those allegations and thus deprived him of "an adequate opportunity to challenge the untested information that served as the basis for the shackling." *Id.* at 1451. Moreover, in the Federal court's view, the State made no showing that shackling "was necessary to further an essential state interest." *Id.* at 1452. There was no indication, it noted, that the judge had considered alternative restraints; nor, citing *Bowers*, did the judge poll (voir dire) the jurors to determine whether they would be prejudiced by seeing Elledge in restraints, or give any cautionary instruction.

Judge Edmondson, in dissent, contended that, in applying the standards applicable to a trial of guilt or innocence to a sentencing proceeding, the court was creating a new rule of Constitutional law not controlled by any Federal precedent. He also complained about vacating the sentence because of the lack of a hearing when no hearing was requested. Judge Edmondson asserted that there *was* a significant difference between a trial on guilt or innocence and a capital sentencing proceeding and that "[w]hen the defendant's right to a presumption of innocence is not present the defendant's constitutional interest in remaining unshackled is severely reduced." *Id.* at 1454.

Interestingly, although the court later denied the State's motion for rehearing and petition for *en banc* hearing, two other judges joined in Judge Edmondson's views. 833 F.2d 250.

We have, of course, a very different situation here than was presented in *Elledge*. Lovell was given an opportunity—at a hearing lasting more than two hours—to state his position; the court did not simply defer to the sheriff, but conducted its own analysis; it did consider all of the circumstances, including the presence of guards; and it did give a cautionary instruction. More significantly, we have, to this point, consistently rejected the Eleventh Circuit Court's notion that the principles and standards that govern a trial of guilt or innocence apply equally to a capital sentencing proceeding.

"Although we would prefer the bases for the judge's conclusions to have been somewhat more explicitly stated, we believe it plain that the trial judge exercised his discretion in determining that leg irons should be on Bowers during the time for trial and he was not influenced solely by the recommendation of the sheriff. We find no abuse of discretion."

*Id.* at 138, 507 A.2d at 1081.

The *Bowers* Court was quite firm in finding no prejudice from the shackling. The concern, which we overcame in the end, was on the discretion issue, and that centered not on the ultimate decision to require shackles, but on whether the judge gave undue deference to the recommendation of the sheriff and thereby failed to exercise his own discretion. In this case, there is no suggestion of that; Judge Horne made his own decision based on his view of the circumstances. With respect to the prejudice, although there was no voir dire of the jury as to the shackling, as none was requested, the court did give a clear instruction that served essentially the same purpose. There can be little doubt that, under a *Bowers* analysis, Lovell would *not* be entitled to a new sentencing hearing because he was shackled.

We next considered the issue of shackling at a capital sentencing hearing in *Hunt v. State,* 321 Md. 387, 583 A.2d 218 (1990). Hunt had been convicted of killing a police officer and was sentenced to death. We vacated the sentence and remanded for a new sentencing proceeding. During the pendency of the appeal, Hunt committed a number of prison infractions; twice he was found in possession of a knife, and on one occasion he feigned illness so he would be taken to the hospital, to "see what my chances of freedom were." *Id.* at 403, 583 A.2d at 225. At the second sentencing proceeding, the court, aware of both Hunt's criminal history (armed robbery and assault) and his more recent conduct in prison, held a hearing to determine whether Hunt should be shackled. It considered, among other things, the presentence investigation report prepared in connection with the first proceeding and the recommendation of the judge who chaired the court's

security committee, and ordered Hunt to wear leg irons. That decision was challenged on the grounds that (1) the trial judge did not adequately explain his reasons for requiring leg irons, and (2) his decision was based "solely on the unsupported recommendation of [the other judge]."

We found no error. We began by confirming the view expressed in *Bowers*, that, although shackling a defendant at a guilt/innocence trial is inherently prejudicial because of the defendant's right to have that determination based solely on the evidence produced at trial, "[w]hen the presumption of innocence is lost as the result of a conviction, there is less risk of prejudice at the sentencing hearing." *Id.* at 409, 583 A.2d at 228. We added:

> "Shackling a defendant during the guilt/innocence phase of trial is inherently prejudicial because it highlights the 'need to separate a defendant from the community at large . . . .' *Holbrook v. Flynn*, 475 U.S. at 569, 106 S.Ct. at 1346, 89 L.Ed.2d at 534. This concern is not as great during the sentencing hearing. It is clear that the defendant will be separated from the community. The only issue is whether the defendant will receive the death penalty or life imprisonment. The defendant's guilt of first degree murder is established and the jury is less likely to be prejudiced by the defendant's appearance in leg irons.

> The defendant 'stands in the position of a convicted felon brought before a trial court for sentencing. He thus is unlike the ordinary defendant who at trial stands clothed with a presumption of innocence.' *Bowers* at 132, 507 A.2d at 1078. Because of this, other state interests may outweigh any prejudice to the defendant. The most obvious is the State's interest in maintaining custody of a convicted murderer. *Perhaps no other defendant appearing before the court has a greater incentive to attempt escape than a convicted murdered facing the possibility of being executed.* His 'best' hope is a life sentence."

*Id.* at 409, 583 A.2d at 228–29 (emphasis added).

The "bottom line," so to speak, was balancing any essential State interest in requiring the defendant to wear leg irons

against "an unacceptable risk of prejudice," that balance to be measured on a case-by-case basis. *Id.* at 410, 583 A.2d at 229. In examining that balance, we identified three essential State interests that may justify restraining a defendant: preventing the defendant's escape, protecting persons in the courtroom, and maintaining order in the courtroom, all three of which were clearly weighed by Judge Horne in the case now before us. In Hunt's case, based on the fact that he left the State after the murder, feigned an illness to consider the prospect of an escape, and was an institutional troublemaker, we found that the record showed Hunt to be "a significant escape risk." *Id.* at 410, 583 A.2d at 229. From that, we concluded that the court had not abused its discretion in determining that the need for some physical restraint outweighed any potential prejudice. We rejected Hunt's complaint that the record did not adequately reflect the basis for requiring leg irons, noting the judge's articulated awareness of Hunt's record of violent crime and anti-social personality, and we also rejected the argument that the judge had delegated his discretion to his colleague.

As guidance to the trial bench, we stated that, when considering extraordinary security measures, a trial judge should employ procedural protections to minimize the possibility of prejudice to the defendants—procedures such as hearing argument on the issue outside the presence of the jury, affording the defendant an opportunity to rebut, and, "upon request, issuing cautionary instructions to the jury or polling the jurors to determine if they would be disposed against the defendant because of the security measures." *Id.* at 413, 583 A.2d at 230–31.

As indicated, those procedural protections were afforded to Lovell. A hearing lasting more than two hours was conducted outside the presence of the jury; Lovell had an opportunity during that hearing to rebut or comment on all of the factors considered by the judge; and, although neither a voir dire question nor an instruction was requested by Lovell, the court, on its own initiative, informed the jury that the shackling was "the normal procedure for anyone already convicted of murder

and facing a serious sentence" and that the jury was "to draw no conclusions regarding future dangerousness or any other conclusions based upon these normal security measures." The majority's conclusion that the instruction was inadequate and was inconsistent with the requirement of an "individualized assessment" is difficult to understand, as it followed precisely what we said in *Hunt* ought to be done.

We last addressed this issue, albeit in *dicta*, in *Whittlesey v. State*, 340 Md. 30, 665 A.2d 223 (1995).[2] When Whittlesey appeared in court for the sentencing hearing, he was in leg irons. He asked that they be removed and that, if the court decided to permit restraints, the court instruct the jury that he was shackled pursuant to Division of Correction standard policy. The court held a hearing, during which it was informed that the Division's standard policy was, indeed, to put "some form of restraint" on defendants during capital sentencing hearings, and that the Division considered Whittlesey as having "escape risk history." Though given an opportunity, Whittlesey did not refute that allegation. The court also noted a recent incident "in which a respondent was not shackled and took advantage of that situation." *Id.* at 84, 665 A.2d at 249. In the end, it required Whittlesey to wear leg irons.

Addressing Whittlesey's complaint, we confirmed what we had said in *Bowers*, that "[t]he trial judge has broad discretion in maintaining courtroom security," but that, "[i]n exercising this discretion, the decision as to whether an accused should wear leg cuffs or shackles must be made by the judge personally, and may not be delegated to courtroom security personnel." *Id.* at 84, 665 A.2d at 249-50. Again rejecting the rationale expressed by the Eleventh Circuit Court in *Elledge, supra*, 823 F.2d 1439, we concluded that, while "[a] judge's discretion over the use of restraints during the guilt-or-

---

**2.** Whittlesey was required to wear leg irons during the sentencing hearing, and he complained about that on appeal. We vacated the sentence for other reasons and addressed the shackling issue to provide guidance to the trial court on remand.

innocence phase of a trial is limited by the Due Process Clause, because such restraints might derogate the presumption of innocence in the eyes of the jury," in a capital sentencing proceeding "unlike the trial on guilt or innocence, the presumption of innocence does not apply." *Id.* at 85, 665 A.2d at 250 (footnote omitted). We did confirm, however, that, even in a capital sentencing proceeding, the defendant is entitled to "an individualized evaluation of both the need for shackling and the potential prejudice therefrom," and recounted, from *Hunt,* the procedures that should be followed in making that evaluation. *Id.* It was not clear from the record in *Whittlesey* whether the judge ordered the restraints because of the general policy of the Division of Correction, because of the unrebutted classification of Whittlesey as an escape risk, or because of the earlier incident involving another defendant, and we therefore urged the judge, on remand, "to follow the directives set out in *Hunt* and *Bowers* before employing any extraordinary security measure and to articulate the reasons underlying any such decision." *Id.* at 86, 665 A.2d at 250.

In my view, Judge Horne followed in full measure the procedures set forth in *Bowers* and *Hunt.* He held a hearing outside the presence of the jury, he allowed Lovell to state his position, he articulated his reasons for requiring the shackling, he made unmistakably clear that he was exercising his own discretion in the matter and was not simply rubber-stamping the recommendation or directive of the Division of Correction or the sheriff, and he gave a cautionary instruction not to draw any adverse conclusion from the shackling. He also noted that the shackling employed was not *unduly* visible: "It's not something that jumps out at one. It is visible if one looks for it, and it will be seen by the jury." What the majority proposes to do in this case is to reverse, not because the judge failed to follow any required procedure, but simply because it disagrees with the decision reached by the trial judge. That, in my view, is wrong for two reasons: first, it flies in the face of the consistent pronouncements of this Court that the matter is within the discretion of the trial judge, who

is the person having the clearest picture of what is required; and second, it rests on a foundation that defies common sense in the context of a capital sentencing proceeding.

I quite agree that, absent some compelling and articulated justification, it is impermissible to shackle or otherwise visibly restrain a defendant in court during a trial as to guilt or innocence. That is so, I think, for at least one, and possibly two reasons. A restraint may, depending on its severity, actually impede the defendant from effectively participating in his or her defense, and only the most compelling circumstance can justify doing that. Even when the restraint is not that limiting, however, it has an inherently prejudicial effect. The defendant is presumed to be innocent. The jury's sole function in that setting is to determine whether the State has produced sufficient evidence to establish his or her guilt of the offense(s) charged beyond a reasonable doubt. Its focus must be only on that, and there is a real danger that viewing the defendant mechanically restrained by leg irons, chains, cuffs, or other such devices may distract the jurors from that singular focus and, even imperceptibly and unknowingly, cause one or more of them to vote to convict on the extraneous and irrelevant ground that the defendant is a dangerous person and ought to be removed from society.

A capital sentencing hearing is, as we have consistently held, quite a different matter, at least with respect to the second reason. The defendant does not stand before the jury with any presumption of innocence. He or she has already been found guilty of one or more crimes sufficiently grievous to warrant consideration of the death penalty, and the jury's only function in that setting is to determine whether the defendant should (1) be put to death, (2) receive life imprisonment without the possibility of parole, or (3) receive life imprisonment subject to the possibility of some future parole. The jury in this case thus well knew that, even if it imposed the most lenient sentence possible—life imprisonment subject to the possibility of parole—Lovell was not about to be released from closely monitored confinement for many, many years, if ever. The jury was made aware that Lovell, a major

drug trafficker, had been convicted of the cold-blooded premeditated murder of a police officer, that after killing Trooper Plank, he shot at another police officer and then fled, that he thereafter broke into a dwelling and threatened its occupants and, had they not been able to subdue him, that he may have killed them as well, and that he had no remorse for having killed Trooper Plank. It is absurd to suppose that there could have been in any juror's mind any doubt that, whatever prospect there may be for his *future* rehabilitation—for *future* dangerousness—Ivan Fitzherbert Lovell, even if only 130 pounds, was then and there a very dangerous man, not one bit averse to killing other human beings and then fleeing. That is why the most lenient punishment they were entitled to mete out was life imprisonment.

In this setting, I expect that the average juror would be at least incredulous, if not truly fearful, to see such a person sitting just a few feet away without some form of visible restraint. No appellate panel, to the best of my knowledge, has been unrealistic enough to profess that such defendants should appear in court for capital sentencing proceedings without appropriate security. Is it less prejudicial for the jury to see the defendant surrounded by a phalanx of armed sheriffs watching his or her every move than to see the defendant mechanically restrained?

The general prevailing view is that a trial judge has discretion with respect to whether and how a defendant is restrained in court. In a trial as to guilt or innocence, that discretion must be exercised in favor of not mechanically restraining the defendant by leg irons, hand cuffs, or other such devices unless a compelling reason exists in that case to do otherwise. At a capital sentencing proceeding, however, it seems to me that the bent can, quite permissibly, be the other way. Subject to three conditions, all of which are at least implicit in what we said in *Hunt* and confirmed in *Whittlesey*, it seems to me that if the judge has any reasonable concern as to whether the mere presence of guards in the courtroom will suffice to maintain order and security, mechanical restraints may properly be employed without the court first engaging in and

recounting on the record an exhaustive analysis of the defendant's social, psychiatric, or criminal history in some unscientific, seat-of-the pants effort to predict whether the defendant is likely to cause a breach of security or order.

It is one thing to require the court to articulate its reasons for requiring shackles, so that we, and the public, can be assured that the decision was not made capriciously and that the judge gave fair consideration to the interests of all concerned—the defendant, the jurors, court personnel, and those charged with safeguarding the defendant and providing courtroom security. There is no fixed, magic matrix, however. Defendants will have different histories and backgrounds, but underlying them all can be a legitimate general concern that a defendant facing the dismal prospect of life imprisonment, at best, and death or life without parole at worst may well try to flee, if given the opportunity. We said exactly that in *Hunt,* and it has been known to happen; it is not a conjured-up flight of fancy.[3] Alone or with help, dangerous criminals have escaped from courtrooms, sometimes taking (and killing) hos-

---

**3.** In 1991, the National Sheriff's Association, under a grant from the State Justice Institute, surveyed sheriffs throughout the country with respect to security violations occurring in courtrooms. The results of that survey, published in a Report to the Association and the State Justice Institute, document the danger. In returns from 29 States, 243 incidents were reported. The relevant findings were as follows:

(1) One-half of the incidents were related to criminal court cases. Most of the incidents happened in the courtroom itself. The sentencing stage was particularly problematic.

(2) Most violations were not preceded by any warning.

(3) The majority of cases involved an actual attack as opposed to a threatened attack. The most common events were assaults, disturbances of the peace, and attempts to flee from custody.

(4) The predominate reasons for the violation were revenge, a desire to escape from custody, or a desire to intimidate or influence the court.

(5) There were no victims in one-quarter of the cases. When there was a victim, it was most often the bailiff or judge. Just over half of the victims were not injured but 4% were killed, 22% required medical attention, and the remainder had minor injuries not requiring medical attention.

(6) When the incident occurred (and most occurred in the courtrooms), half the courts had a security person stationed in the courtroom but half did not.

tages in the process. If, by setting too strict a standard, we tie the hands of the judge, rather than those of the defendant, we set the scene for just such a tragedy.

I do not suggest a carte blanche open-ended discretion but would simply follow what we have already declared: that (1) the defendant be afforded a fair opportunity, outside the presence of the jury, to challenge the request that he or she be restrained, (2) the restraints ultimately required be reasonable ones, not exceeding what is necessary, and that efforts be made to render them as innocuous as practicable, and (3) either through voir dire or clear instructions, or both, the jury be informed that the restraint is a customary procedure and is not to influence their decision with respect to an appropriate sentence. I believe that those conditions were met in this case.

Judge CHASANOW has authorized me to state that he joins in this concurring opinion.