Mario MARQUEZ, Petitioner–Appellant,

v.

James A. COLLINS, Director, Texas Department of Criminal Justice, Institutional Division, et al., Respondents–Appellees.

No. 92–5642.

United States Court of Appeals, Fifth Circuit.

Jan. 10, 1994.

---

Michael Tigar, and Robert McGlasson and Eden E. Harrington, Texas Resource Center, Austin, TX, Sandra L. Babcock, Texas Resource Center, Houston, TX, for petitioner-appellant.

William C. Zapalac, Asst. Atty. Gen., Austin, TX, for respondents-appellees.

Before HIGGINBOTHAM, SMITH, and DeMOSS, Circuit Judges.

PATRICK E. HIGGINBOTHAM, Circuit Judge:

In his first federal habeas petition, Mario Marquez urges that his conviction of capital murder and sentence of death imposed by a Texas jury must be set aside for four consti-tutional errors. He first contends that he has been denied due process and a fundamentally fair trial because he was handcuffed behind his back and forced to wear leg irons during the sentencing phase of his trial, arguing that the district court failed to hold a required hearing and that there was no justification for the restraints. Second, Marquez urges that his trial counsel was precluded from presenting mitigating evidence by the structure of the Texas capital sentence jury questions. Third, Marquez urges that the jury was precluded from considering mitigating evidence contrary to *Penry v. Lynaugh*, 492 U.S. 302, 109 S.Ct. 2934, 106 L.Ed.2d 256 (1989). Finally, he contends that the trial judge allowed the jury to consider prior unadjudicated offenses during the sentencing phase of his trial without requiring that the jury find that the state had proven their factual basis beyond a reasonable doubt, denying his rights under the Fifth, Eighth, and Fourteenth Amendments.

## I.

### A.

The Texas Court of Criminal Appeals on direct appeal rejected Marquez's contentions regarding the trial restraints, and we reject his contentions for essentially the same reasons. *Marquez v. State*, 725 S.W.2d 217, 226–231 (Tex.Crim.App., *cert. denied*, 484 U.S. 872, 108 S.Ct. 201, 98 L.Ed.2d 152 (1987). We agree with Marquez that the appearance of a defendant in shackles and handcuffs before a jury in a capital case requires careful scrutiny. Shackling carries the message that the state and the judge think the defendant is dangerous, even in the courtroom. It is not that shackling signals the prosecutor's opinion—indeed, there is nothing subtle about the prosecutor's view. A jury knows and understands that. It is obvious that an accused does not enjoy unfettered freedom and may in fact not be on bail. It follows that because an accused is led away each day does not unduly tax his claim of innocence.

Apart from the risk of prejudice to the defendant, the indecorous appearance of a shackled defendant in an American trial

demands close scrutiny of the practice. Solemnity and that indefinable but knowable ambiance of evenhanded judicial disinterest and respect for the dignity of individuals are components of a fair trial. Rules will not alone create them but rules can maintain the conditions in which they flourish.

When the complained of restraint comes only in the sentencing phase of a capital charge, a jury has just convicted of a violent crime—so the risk of prejudice is lessened from the risk of such events during the guilt phase. At the same time, the defendant's life turns on the same jury's answer to the question of *future* dangerousness, so the risk, although less, is not eliminated. Restraint at trial may carry a message that a defendant continues to be dangerous.

■ On the other hand, shackling a defendant may be necessary to preserve the dignity of the trial and to secure the safety of its participants. It is immediately apparent that any rule that would accommodate these competing interests rests on the word "necessary". The required scrutiny must balance the state's interest of safety and decorum against these concerns. Simply put, a defendant must not be shackled before his jury unless the restraint is necessary to protect the safety of the trial participants or the sanctity of the trial itself.

■ We need not detail the images conjured by the range of restraints of a defendant in the courtroom to conclude that the threats to a fair trial posed by visible restraints are sufficiently large and sufficiently likely that due process secures to the defendant a right to contest their necessity. *Elledge v. Dugger*, 823 F.2d 1439, 1451–52 (11th Cir.1987), *cert. denied*, 485 U.S. 1014, 108 S.Ct. 1487, 99 L.Ed.2d 715 (1988); *Zygadlo v. Wainwright*, 720 F.2d 1221, 1223–24 (11th Cir.1983), *cert. denied*, 466 U.S. 941, 104 S.Ct. 1921, 80 L.Ed.2d 468 (1984).

■ The process due must reflect the inherent case-specific character of the trial court's decision to restrain a defendant and the reality that the issue is usually collateral to the trial itself. Relatedly, because the trial judge is uniquely situated to make this judgment call he must be given considerable discretion. Given this discretion, it is not a question of whether, looking back, lesser restraints might have been adequate, although that is relevant. Rather, it is a question of whether it was reasonable to conclude at the time that the restraint was necessary. Put another way, necessity does not here trigger a type of "least means" analysis. That in retrospect some lesser restraint might have sufficed is not determinative. The trial judge must only have acted reasonably in responding to the scene before him using no more restraint than appeared necessary.

■ Finally, in this federal habeas context we will not upset a state trial judge's decision absent a clear abuse of discretion. In a practical sense, our review is analogous to review of a state trial judge's ruling on a *Witherspoon* objection. *See Wainwright v. Witt*, 469 U.S. 412, 426–30, 105 S.Ct. 844, 854, 83 L.Ed.2d 841 (1985).

### B.

■ The Texas Court of Criminal Appeals described the events leading to shackling Marquez as follows:

[D]uring the afternoon session of the first day of the punishment phase, the trial judge ordered that appellant be handcuffed and shackled for the remainder of the trial. The judge made the following findings as justification for the order on November 26, 1984, just prior to instructing the jury on punishment.

THE COURT: ... I will go ahead and make my findings of fact at this time. The defendant has been found guilty of choking the complainant to death. At the same time he choked his former wife to death. The defendant while in jail has carried deadly weapons on his person. The Defendant while in jail stabbed a fellow inmate with a ballpoint pen. The Defendant while in jail choked a fellow prisoner. In 1983 the Defendant attempted to murder a uniformed officer driving a marked autombiles [sic] while trying to evade arrest for four burglaries. The Defendant endangered the lives of many innocent people while

trying to evade arrest by driving on the wrong side of the freeway.

Since being found guilty of capital murder while being transferred from the courtroom the Defendant attacked a television cameraman by knocking his television camera to the floor and on the same occasion, spit on another cameraman or spit on a camera. In fact, since being found guilty of capital murder the Defendant threatened prosecutor Ed Garcia in the courtroom.

The Defendant on numerous occasions since being found guilty of capital murder has threatened to run and cause the officers to have to shoot him and kill him. Unless his legs are chained there is a danger he will do so.

The Defendant is young, powerful and very quick and there is a grave danger he might grab the firearms of an officer and kill officers of the court and onlookers unless he is kept in handcuffs.

MR. SPRINGER: May I add something to the court's findings, Your Honor?

THE COURT: Yes, sir.

MR. SPRINGER: I believe that the Court was correct that the Defendant did have the leg brace on at the time that he assaulted the cameraman.

THE COURT: That failed to restrain him from assaulting a cameraman who was anywhere from three to five feet away and while counsel for Defendant has frequently referred to the situation as being a circus atmosphere, the court finds that no such atmosphere has existed either in the courtroom or in the hall except that which was brought on by the Defendant himself when he attacked the cameraman.

In fact, two disputes took place in the hall and the court immediately removed people that [sic] engaged the defendant in an argument. And there has been absolutely no circus atmosphere tolerated and none will be tolerated. All right. Anything else?

MR. SPRINGER: Yes. I believe that the Defendant has told the court that he was thinking about committing suicide and has told the bailiffs and everybody he wasn't afraid of the needle and he was not afraid to die, which shows that he is an extremely dangerous individual.

THE COURT: Well, the court adopts those statements as part of the findings and there is at least one more in the courtroom that has four young children that [sic] is an officer of the court whose life would be in danger. There's several others with children to be raised. There's numerous officers of the court, bystanders, people whose lives would be in danger if this Defendant were allowed to not be handcuffed. There is no doubt in this court's mind that he is a grave danger to the people in this courtroom as well as to himself.

At the time the trial judge made his findings he had already heard all of the evidence presented at both the guilt/innocence and punishment phases of trial. Some of his findings were based on the evidence then presented and summarized at the outset of this opinion. In the interests of time and space we will not review that evidence here. However, certain other evidence, presented close to the time and at the time of trial, obviously bore on the judge's findings and it will be reviewed.

On July 12, 1984, a hearing was held on a motion for withdrawal of appellant's counsel because of appellant's inability to pay. During that hearing the following testimony was elicited.

THE COURT: Obviously you don't have the money so I'm going to appoint a lawyer to represent you.

MR. MARQUEZ: That's okay, sir, because I ain't got to talk to him. I ain't got to talk to no State's attorney. I would rather be dead than talk to a State's attorney.

THE COURT: That may be exactly the problem you face. You understand you are charged with capital murder which could result in the death penalty for you?

MR. MARQUEZ: That's okay.

THE COURT: So its not one of these things that can be taken lightly. It is a very—

MR. MARQUEZ: Anyway I was going to take my life last night. I was about to do it last night.

THE COURT: I see you didn't do it. All right. I want to thank you all very much.

On October 18, 1984, a pretrial hearing was held on appellant's motion to suppress certain oral statements made while in custody. During the course of that hearing Detective Anton Michalec testified as to remarks made by appellant at the police station shortly after his arrest.

Q. [by the State's Attorney]: Did he say anything else about—

A. Well, he did indicate that the police officer that [sic] apprehended him where he was apprehended was yellow for not shooting him and he said he wished he would have shot him and just got it over with and he indicated that—by his actions and so forth that—I took it he might try to commit suicide, and I called the jail and notified the jail that he may have some suicidal tendencies at the time, so 'watch him.'

Q. Did he say whether or not he told the officer that the officer was yellow for not shooting him?

A. No, sir.

Q. What did he say?

A. He just told me in his own words that he felt that the officer should have shot him when he apprehended him and just gotten it over with then and there.

Q. Did he say why the officer should have shot him?

A. No, he said he wasn't a man, though, for not shooting him ...

\* \* \* \* \* \*

Q. [by appellant's counsel] All right. 'He said after this he wanted to commit suicide and would hang himself?'

A. Yes.

Q. He did say that.

A. Yes.

Q. Did he specifically mention that he wanted to hang himself?

A. Yes, ma'am. It would not be in my report if he didn't.

Q. All right. What did you say to that?

A. Well, I made no reply, but like I said earlier, I did call the jail because he made those threats. I was concerned that he might try to harm himself and I told him what he said.

Q. All right. Then also he talked of how he wanted the police officer that caught him to shoot him?

A. Yes.

Later during the hearing evidence was presented to show that appellant was the subject of a prior outstanding arrest warrant for robbery involving a bodily injury. The outstanding warrant was issued three weeks before the murder in the instant case.

On November 26, 1984, one of the State's Attorneys, Edward Garcia, stated in closing argument that,

[A]fter the altercation that was had Monday at the doorway [1] when Mr. Marquez was brought in and sat down by the bailiffs, he was cursing in Spanish and he said something to the effect that 'I'm tired of people treating me like an animal.' And I was sitting to his left and Mr. Marquez looked at me and glared at me and said, 'That goes for that guy sitting at the table there.'

Earlier on November 26, 1984, the court, outside the presence of the jury heard the following testimony from Lieutenant Billhartz of the Bexar County Sheriff's Department.

THE COURT: All right. Have you been supervising the handling of the Defendant, Mario Marquez, through the time he has been charged with the capital offense?

MR. BILLHARTZ: Yes, I have.

THE COURT: All right. Let me ask you this. In your opinion are the threats and actions of the Defendant such that you feel it is necessary that he

---

1. This refers to the incident with the television camera.

be handcuffed and have leg irons during the rest of this trial?

MR. BILLHARTZ: Yes, I believe they are.

\* \* \* \* \* \*

Q. [by appellant's counsel]: Are you familiar with the leg brace Mr. Marquez is wearing right now?

A. Yes, I am.

Q. What is the purpose of that leg brace?

A. To keep a person from running.

Q. Okay. Do you have any information that Mr. Marquez has actually run off anytime during this trial?

A. Not yet, but he's made statements to the effect.

Q. Okay. But no actual running?

A. No. I don't have any information

MR. STEVENS: That's all we have.

THE COURT: If he were not handcuffed, would there not be a danger of his grabbing the pistol of one of these bailiffs.

MR. BILLHARTZ: I think that is true.

THE COURT: And would the lives of all the court officers be endangered?

MR. BILLHARTZ: It would.

After this testimony the trial judge made the findings above and overruled appellant's final objection to the handcuffs and leg irons. Appellant was not displayed to the jury in leg irons and handcuffs prior to their convicting him of capital murder.

*Marquez*, 725 S.W.2d at 228–31.

#### C.

Marquez's able counsel argues that the prior acts of violence were not so violent, but does not rest there. Rather, Marquez contends that he was denied an opportunity to be fully heard before he was shackled. The argument points out that Marquez was ordered shackled in the afternoon of the first day of the sentencing phase of the trial; that the state trial judge did not make his findings regarding the safety risks of an unshackled Marquez until shortly before instructing the jury at the close of the sentencing phase. The argument goes that this was a shackle now, explain later, approach that denied Marquez a fair arbiter. When the trial court made his findings he was justifying a decision earlier made, it is said, and therefore was not about the business of fair decisions. We are not persuaded. The trial court did decide to shackle Marquez before he issued his reason from the bench. There is nothing untoward about that—if Marquez had a reasonable opportunity to be heard on the subject of restraint before it was a fact.

Marquez never requested a hearing. We doubt that the state trial judge was constitutionally obliged to conduct a hearing in the absence of a request for one. We do not rest here because we further conclude that the state judge had a reasonable basis for the order to put on leg irons and handcuff Marquez at the time he ordered it. We are also convinced that Marquez had a constitutionally adequate opportunity to participate in the development of the facts underpinning the state judge's decision. The state trial judge had, in Marquez's presence and with his full opportunity to cross-examine, heard the following evidence in open court *before* ordering the shackling: (i) Marquez pleaded guilty on January 11, 1984 to four separate indictments for burglary and an earlier theft in 1977; (ii) defendant fled police in an automobile and exchanged gunfire with the pursuing police while going the wrong way on a major thoroughfare at speeds up to 100 mph; (iii) as a juvenile Marquez was charged with "robbery by assault, strongarm, ungovernable, unlawfully carrying a knife, paint sniffing and burglary of a nonhabitation"; (iv) he had that morning assaulted television cameramen in the hallway while wearing leg braces; and (v) he said he was going to run and the bailiffs would have to shoot him.

The trial judge knew that the bailiffs were each armed; that the defendant had the quickness and strength to seize a bailiff and perhaps take his weapon placing at risk persons in the courtroom. The possibility of this occurring loomed large in the trial judge's thinking. Less may have been enough, but we are persuaded that these facts, with the fresh conviction for capital murder entailing proof of two vicious mur-

ders and a violent sexual assault, were enough.

## II.

■ Marquez also asserts that the Texas capital sentencing scheme violated the Eighth Amendment by restricting his opportunity to present mitigating evidence. *See Penry v. Lynaugh,* 492 U.S. 302, 109 S.Ct. 2934, 106 L.Ed.2d 256 (1989). He also claims that this constraint deprived him of his right to effective assistance of counsel guaranteed by the Sixth Amendment by unduly narrowing the options available to him at sentencing. *See Strickland v. Washington,* 466 U.S. 668, 104 S.Ct. 2052, 80 L.Ed.2d 674 (1984). He asserts that he had no meaningful opportunity to present mitigating evidence that, *inter alia,* he is mentally retarded and was abused as a child.

We cannot reach the merits of Marquez's claims because he made the tactical decision not to present the mitigating evidence on which he bases this appeal. "We have previously ruled that a defendant's deliberate failure to introduce mitigating evidence as a tactical decision ... does not come within the requirements announced in *Penry." May v. Collins,* 904 F.2d 228, 232 (5th Cir.1990), *cert. denied,* 498 U.S. 1055, 111 S.Ct. 770, 112 L.Ed.2d 789 (1991) (citations and internal quotation marks omitted). Marquez argues that he made this decision under troubling circumstances. At the time of his trial, the only use that the jury could have made of his evidence would have been adverse to his case and he had no reason to believe he was entitled to a special instruction to the jury. This circuit has considered this argument already, however, and has ruled in a manner that offers Marquez no relief under the Eighth Amendment. The same is true of Marquez's Sixth Amendment claim. *See May v. Collins,* 948 F.2d 162, 166–68 (5th Cir.1991), *cert. denied,* —— U.S. ——, 112 S.Ct. 907, 116 L.Ed.2d 808 (1992).

## III.

■ Marquez also argues that the trial court did not afford the jury the opportunity to consider all of the mitigating evidence that Marquez proffered. In particular, the trial court refused to submit to the jury the issue "whether the conduct of the defendant in killing the deceased was unreasonable in response to the provocation, if any, by the deceased." Marquez wanted the jury to consider whether he perpetrated his heinous acts of physical and sexual violence in response to infidelity by his wife. As Marquez stood accused of murdering his niece, not his wife, under Texas law there was no provocation "by the deceased" and therefore no basis for submitting the issue to the jury. *See Hernandez v. State,* 643 S.W.2d 397, 401 (Tex.Crim.App.1982), *cert. denied,* 462 U.S. 1144, 103 S.Ct. 3128, 77 L.Ed.2d 1379 (1983).

■ Marquez argues that the fact that he was in a jealous rage could have mitigated the wrong he committed by inflicting physical and sexual violence on his innocent niece. Whether or not this claim has merit, he is wrong in asserting that the jury had no vehicle for considering it. The jury could have concluded that Marquez killed in an angry response to infidelity and therefore that he would be unlikely to be dangerous in the future. We have noted in the past that "*Penry* does not require that a sentencer be able to give effect to a defendant's mitigating evidence in whatever manner or to whatever extent the defendant desires." *White v. Collins,* 959 F.2d 1319, 1322 (5th Cir.1992). In light of this standard, we have held that the special issue addressing future dangerousness meets the constitutional requirements for considering the relevance of youth, even though no special provision is made to reflect the fact that the young may be less culpable. *Id.* at 1324. We conclude that the jury had an adequate opportunity to consider that infidelity may have prompted Marquez's violent acts.

## IV.

Finally, Marquez argues that the trial court erroneously allowed the court to hear evidence of various of Marquez's misdeeds that were unrelated to the murder for which he stood trial. As the jury had no obligation to find that the state had proven beyond a reasonable doubt that Marquez had committed these acts, Marquez asserts that consid-

eration of this evidence was unconstitutional. We have rejected this claim in the past. *Milton v. Procunier,* 744 F.2d 1091, 1097 (5th Cir.1984), *cert. denied,* 471 U.S. 1030, 105 S.Ct. 2050, 85 L.Ed.2d 323 (1985). We need not consider it again now. We AFFIRM the district court's dismissal of Marquez's petition and VACATE the stay pending appeal.