BARNES, J.,
for the Court:
¶ 1. A Tunica County jury convicted La-titus Jones of uttering forgery. The trial judge sentenced Jones as a habitual offender to ten years in the custody of the Mississippi Department of Corrections (MDOC). Jones now appeals, claiming that his indictment was defective; he was prejudiced by appearing shackled before the jury; an audio recording of his interview by law enforcement should have been suppressed; and the weight and sufficiency of the evidence was inadequate. Finding no error, we affirm.
STATEMENT OF FACTS AND PROCEDURAL HISTORY
¶ 2. In August 2010, Jones was indicted for uttering forgery of a check. The charge stems from an incident on or about Saturday, October 17, 2009.[1] On that day, shortly before closing time, Jones entered *522 the Money Tree, a check cashing business in Tunica, Mississippi, and presented a check for $950.09 to employee Linda Tutor to be cashed. The check was drawn from the account of “Real’s Trucking, Inc.,” in Gunnison, Mississippi, and dated October 12, 2009, for “contract labor.” The account was at Woodforest Bank, and the check was signed by “Joe Peals.” Since it was Saturday, Tutor could not verify the check with the bank’s automated telephone number, but she cashed it for Jones anyway. Seven days later, Tutor learned the check did not clear the bank.
¶ 3. Jones then made a second trip to the Money Tree on or about Saturday, October 24, again at closing time, attempting to cash another check for $950.87, drawn from “Goss Roofing, Inc.,” in Greenville, Mississippi, dated October 22, 2009, and signed by “Tom Best.” Tutor did not cash the check but instead contacted law enforcement and made casual conversation with Jones until the police arrived. Law enforcement asked Jones to come to the police station for an interview, and Jones complied. After the interview, he was released. Over a month later, a warrant was issued for Jones’s arrest in connection with uttering a forgery and the robbery of a Kroger store in Washington County. On December 4, 2009, Jones was interviewed a second time by law enforcement.
¶4. In August 2010, Jones was indicted for one count of uttering forgery in Tunica County. The text of the indictment related to the first check from Real’s Trucking. However, erroneously attached to the indictment was a copy of the second check from Goss Roofing.
¶5. In July 2011, Jones’s two-day trial commenced. He appeared at the courthouse in his yellow MDOC prison jumpsuit, wearing a waist shackle and leg irons. The prosecution raised a concern about the jury’s seeing Jones restrained; so a hearing ensued in the judge’s chambers. After testimony from MDOC officers about whether Jones should remain restrained, the judge decided Jones should not walk before the jury with restraints on, but would already be seated at the defense table when they entered. However, after voir dire, the judge noted it was apparent the jury had seen Jones’s restraints. Therefore, prior to the State’s opening statement, he instructed the jury that the fact Jones was already in the custody of the MDOC had no bearing on his guilt or innocence for the current charge. Then, during the State’s opening statement, the jury had to be excused when the court reporter had technical difficulties. Upon their return, the judge announced that Jones’s restraints had been removed, and again instructed the jury to disregard the restraints as evidence of guilt or innocence. On the second day of trial, Jones was not shackled and wore civilian clothes.
¶ 6. Also, before trial, a hearing was held on a Miranda[2] violation Jones alleged in a pro se pretrial motion. The allegation concerned statements taken by Officer Michael Nichols, chief investigator for the Tunica Police Department, who conducted the two interviews with Jones in October and December of 2009. Officer Nichols was examined, as well as Jones. Two signed waiver-of-rights forms for each interview were introduced into evidence. The judge found no Miranda violation had occurred during the interviews.
¶ 7. At trial the State called four witnesses. Officer Nichols testified that he was notified by Money Tree when no record of the account for the first cashed check was found. He called the Woodfor- *523 est Bank and discovered the check’s account never existed. There was also no response when Officer Nichols called the phone number listed on the check for “Real’s Trucking.” Further, when a computer search was done for the address of the alleged company in Gunnison, it could not be found. Satellite computer photographs showed the area to be residential.
¶ 8. The first time Officer Nichols interviewed Jones was after Jones attempted to cash the second check on October 24, 2009. At that time, Officer Nichols could not verify that the Goss Roofing check was invalid, but he confronted Jones about the invalidity of the Real’s Trucking check. Jones told him both checks were for some work he had done for two different people, but he could not provide Officer Nichols with the names of the individuals who had given him the checks. Also during the interview, Jones revealed he was from Rosedale, Mississippi, and had a cousin by the name of “Joe Pearls,” but he did not provide any further useful information for the investigation, and was released.
¶ 9. On December 4, 2009, Officer Nichols interviewed Jones again. At this point, Jones was under arrest, and gave a statement that revealed an illegal check-cashing scheme, whereby he and others were receiving the checks from an individual named Ellis Urshery. The CD audio recording of both of Jones’s statements was entered into evidence, and portions were played for the jury during Officer Nichols’s examination. In both interviews, Officer Nichols immediately advised Jones of his Miranda rights, and Jones signed a statement waiving those rights.
¶ 10. Tutor, who had worked at Money Tree for approximately four years, related Jones’s two check-cashing attempts. Additionally, Woodforest Bank employee Tameka Dowl from the Senatobia, Mississippi branch testified that she could not find the account’s name or number in the bank’s system for the first check. The bank also has branches in Greenville and Clarksdale, Mississippi. Finally, a Gunni-son resident testified that the address on the Real’s Trucking check was actually her residential address, and there had never been such a business at the house or in Gunnison. The residence had been purchased after a foreclosure.
¶ 11. The State then rested, and the defense did not call any witnesses. The jury found Jones guilty of uttering forgery. At Jones’s sentencing hearing, proof of two prior convictions was entered into evidence — a bank robbery in Illinois in 1999 and the Washington County Kroger robbery in 2009. The judge sentenced Jones as a habitual offender under Mississippi Code Annotated section 99-19-81 (Rev.2007) to ten years in the custody of the MDOC, without the possibility for parole or probation. Jones filed a motion for a judgment notwithstanding the verdict (JNOV) or, in the alternative, a new trial, which was denied. Jones timely appealed.[3]
ANALYSIS
1. Indictment
¶ 12. Jones argues that his indictment is fatally defective because the check described in the indictment for uttering forgery (the check drawn from “Real’s Trucking, Inc.,” on October 12, 2009 for $950.09) was not attached to the indictment. Instead, the second check Jones attempted to cash at the Money Tree (from “Goss *524 Roofing, Inc.,” on October 22, 2009 for $950.87) was attached. He states this error warrants reversal of his conviction.
¶ 13. The purpose of an indictment is to give the defendant reasonable notice of the charges against him in order that he may prepare an adequate defense. Brawner v. State, 947 So.2d 254, 265 (¶ 31) (Miss.2006) (citing Brown v. State, 890 So.2d 901, 918 (¶ 61) (Miss.2004)). Indictments must contain “a plain, concise and definite written statement of the essential facts constituting the offense charged and shall fully notify the defendant of the nature and cause of the accusation.” URCCC 7.06. The ultimate test for the validity of an indictment is whether the defendant was prejudiced in preparing his defense. Medina v. State, 688 So.2d 727, 730 (Miss.1996). Whether an indictment is fatally defective is a question of law, which this Court reviews de novo. Moten v. State, 20 So.3d 757, 759 (¶ 4) (Miss.Ct.App.2009).
¶ 14. Jones admits that this issue was never raised before the trial court. While Jones did file a pro se motion to quash his indictment for various reasons, it did not include this specific issue. The State argues the issue is procedurally barred. Generally, “[a] trial judge will not be found in error on a matter not presented to him for decision.” Gray v. State, 728 So.2d 36, 70 (¶ 169) (Miss.1998) (quoting Jones v. State, 606 So.2d 1051, 1058 (Miss.1992)). “It is only in cases where the indictment does not charge an offense that defects in an indictment may be challenged on appeal for the first time.” Salisbury v. State, 293 So.2d 434, 436 (Miss.1974) (citing Cohran v. State, 219 Miss. 767, 775, 70 So.2d 46, 48 (1954)).
¶ 15. Additionally, courts may amend an indictment as to defects of form, but only the grand jury may correct defects of substance. Jones v. State, 912 So.2d 973, 976 (¶9) (Miss.2005). “An amendment is one of form if the amendment is immaterial to the merits of the case and the defense will not be prejudiced by the amendment.” Id. (citing Pool v. State, 764 So.2d 440, 443 (¶ 10) (Miss.2000)). “The test for whether an amendment to the indictment will prejudice the defense is whether the defense as it originally stood would be equally available after the amendment is made.” Id.
¶ 16. “Defects on the face of an indictment must be presented by ... demurrer.” Gray, 728 So.2d at 70 (¶ 169) (citing Brandau v. State, 662 So.2d 1051, 1054 (Miss.1995)). When “the formal defect is curable by amendment!,] the failure to demur ... will waive the issue from consideration on appeal.” Id. (quoting Brandan, 662 So.2d at 1055). Jones admits there was no demurrer for this error, but claims the error is substantive, and not one of form; so no demurrer was needed to preserve the issue for appeal. We disagree, and find this defect was one of form, and could have been cured by amendment. Additionally, the change would have been immaterial to the merits of the case. Therefore, the issue is procedurally barred because Jones did not raise it below.
¶ 17. Even if the issue was not procedurally barred, it is without merit. The text of the indictment specifically states:
Jones ... on or about October 15, 2009 ... did unlawfully, wilfully and felo-niously, utter or publish as true to Linda Taylor,[4] at Money Tree, a certain *525 forged, altered or counterfeit instrument purporting to be check no. 1029 dated October 15, 2009, on the Woodforest Bank, account of Real Trucking, Inc., in the amount of $950.09, when he ... knew the same to be forged, altered or counterfeit with the intent to defraud ... Woodforest Bank, and/or Money-Tree, and/or Real Trucking, Inc., there being a true and correct copy of said check attached hereto and made a part hereof....
While there was not a “true and correct copy” of the described check attached to the indictment, we find the indictment’s text gave Jones sufficient notice of the uttering-forgery charge against him, so that he could prepare an adequate defense. The State made no attempt to correct or amend the attachment, but the record does not indicate Jones or his counsel were confused about the nature of the charge.
¶ 18. Jones cites to Copeland v. State, 423 So.2d 1333 (Miss.1982), in support of his argument. There, the supreme court found the indictment substantially flawed because the State left out certain numerals from the description of a chemical compound for an illegal drug. Id. at 1336-37. Due to the error, the indictment actually described a drug that was not illegal; therefore, the indictment did not charge the defendant with a crime. Id. Copeland is distinguishable, however. Here, we have an indictment that fully describes within its text the crime of uttering forgery and the check used in that crime. Additionally, both checks were entered into evidence at trial.
¶ 19. Jones argues different elements of proof for uttering forgery would be required with the Goss Roofing check, and that it was error to discuss that check in the State’s case. Again, we disagree. Officer Nichols described his investigation of the Real’s Trucking check, and the lack of a valid account, which led to a warrant for Jones’s arrest. Jones was arrested when he attempted to cash the Goss Roofing check, which was for nearly the same amount as the prior check, at the Money Tree. Accordingly, we cannot find Jones’s defense was prejudiced by having the Goss Roofing check attached to his indictment. We find no reversible error.
2. Restraints
¶ 20. Jones claims the trial court committed plain error by “forcing”[5] him to be shackled during the jury-selection process. Because he was unduly prejudiced Jones argues, his conviction should be reversed and a new trial granted.
¶ 21. In Mississippi,
[i]t is a common-law right of a person being tried for the commission of a crime to be free from all manner of shackles or bonds, whether of hands or feet, when in court in the presence of the jury, unless in exceptional cases where there is evident danger of his escape or in order to protect others from an attack by the prisoner. Whether that ought to be done is in the discretion of the court, based upon reasonable grounds for apprehension. But, if this right of the accused is violated, it may *526 be ground for the reversal of a judgment of conviction.
Jones v. State, 20 So.3d 57, 60 (¶ 10) (Miss.Ct.App.2009) (quoting Rush v. State, 301 So.2d 297, 300 (Miss.1974)). However, there must be a showing of prejudice to the defendant before we will reverse a conviction on this ground. Williams v. State, 962 So.2d 129, 131 (¶ 8) (Miss.Ct.App.2007) (citing Payton v. State, 897 So.2d 921, 932 (¶ 16) (Miss.2003)). The Mississippi Supreme Court has held that, “[generally, we have not found the right to a fair trial to have been abridged where the defendant has been seen in the courtroom by the jury in shackles or handcuffs.” McGilberry v. State, 843 So.2d 21, 27 (¶ 7) (Miss.2003) (quoting Brown v. State, 690 So.2d 276, 287 (Miss.1996)). Furthermore, because the trial judge is uniquely situated to make the judgment call, he is given considerable discretion regarding the decision to restrain a defendant. Marquez v. Collins, 11 F.3d 1241, 1244 (5th Cir.1994).
¶ 22. Jones appeared at the courthouse the first day of trial wearing his prison attire,[6] along with waist and leg restraints. In chambers, prior to appearing before the prospective jurors, the prosecution raised concerns about Jones’s being seen by the venire in restraints. Also, Jones and his attorney explained why he was in prison clothing.[7] A hearing ensued about these matters, and the following exchange occurred among two MDOC transport officers, the attorneys for both parties, and the trial judge:
BY THE COURT: Is Mr. Jones a security concern?
BY OFFICER [KENNETH] DIXON: Sir, so far he has not gotten belligerent with us. Since I’ve been in this courthouse, he has cussed a lieutenant, I believe, with the sheriffs department about the clothing that was offered to him. He has put some type of bodily fluid on my restraints. I would have to be ordered from you to take those restraints off, sir, and I would not feel comfortable doing so.
BY THE COURT: Ms. [Sherry] Re-vette, how about your views on this?
BY MDOC OFFICER REVETTE: Our orders are that if you tell us to take them off, we can take them off, but we have to follow your orders.
BY THE COURT: Do you have any concerns about a security issue?
BY MDOC OFFICER REVETTE: I don’t know him, and our orders on our paper said he was to remain in restraints the whole time we had him gone.
BY THE COURT: ... Mr. Williams [assistant district attorney], your view sir?
BY MR. WILLIAMS: I don’t know his custody level. I would imagine it’s certainly not one that would allow him to have free restraint given the fact that he’s housed in southern Mississippi. So I would certainly want him to be restrained, but my only concern is how do we get him in the courtroom while he’s restrained with the jury present. Do we remove the jury out, allowing him to take his seat and then bring them back in or what?
BY THE COURT: Mr. Johnson [defense attorney], do you have a position, sir?
*527 BY MR. JOHNSON: Your Honor, a couple of positions on that. Your Hon- or, I think that we can’t force him to change clothes, but I think — when he comes in, I don’t think that the restraints can be obvious, your Honor....
BY THE COURT: Well, I can have the jury removed, and I can have Mr. Jones placed at defense counsel so that it will not be apparent- Mr. Jones, what restraints do you have, sir?
[[Image here]]
BY MDOC OFFICER DIXON: Waist shackle and leg irons.
[[Image here]]
BY THE COURT: All right. Well, if he were to keep his arms down, I don’t think it would be readily apparent to the jury that he was—
[[Image here]]
BY DEFENDANT JONES: So I have to be very — quite still with these bells on.
[[Image here]]
BY THE COURT: Well, at this point and time, here’s what we’re gonna do. I’m gonna have the jury removed from the courtroom. I’m gonna have Mr. Jones seated at defense counsel in his restraints and since he chooses to be in his yellow jumpsuit, he will remain in his yellow jumpsuit. We will go about the business of picking this jury.
(Emphasis added.) The transcript indicates the venire came into the courtroom with Jones already seated at the defense table. Voir dire took place for approximately one hour, during which Jones was asked to stand when introduced to the venire. When voir dire concluded, Jones remained seated while the venire exited the courtroom. The venire was called back into the courtroom after jury selection concluded, while Jones remained seated. The jurors were impaneled, sworn, and then excused for lunch after approximately ten minutes.
¶ 23. After the jury had exited the courtroom, the trial judge asked both counsel to approach the bench. He noted that it was obvious the jury had observed Jones in prison attire and restraints, and likely concluded he is already an inmate of the MDOC. The attorneys for both the State and Jones agreed that it would be appropriate for the judge to inform the jury that Jones’s attire and restraints have no relevance to his guilt or innocence for the charge then before the court. Therefore, before opening statements, the trial judge made the following statement to the jury:
[A]s you can tell, the defendant here today is dressed in jail garb. He’s not dressed in street clothes. That’s obvious. Simply because he is in jail or prison now has nothing to do with his guilt or innocence of this particular charge. We’re here today on an uttering forgery charge, and that’s all. You are not to consider the fact that he may be in custody at this time on any other matter. It’s not material to his guilt or innocence on this charge. We’re just trying this charge here today. Everybody understand that?
[[Image here]]
By policy, you will see that [Jones] is shackled. I know that you have seen that previously. Again, [it] has no bearing on his guilt or innocence on this charge. Not to consider that with regard to this charge. Does everybody understand that?
[[Image here]]
Is there anybody who cannot do that? All right.
The State then proceeded with its opening statement. However, after a break in the State’s opening statement due to technical errors with the transcription, the trial *528 judge made the following announcement to the jury:
Let me inquire again, though — despite whatever policies there may be in place, I ordered that the handcuffs and other matters, restraints, be removed from the defendant. I want to make certain that the defendant has not been 'prejudiced in your eyes by having those restraints on. Now you understand that has nothing to do with his guilt or innocence in this particular case here today? Everybody understands that?
[[Image here]]
Can y’all disregard that fact? ... [I]s there anybody that cannot disregard that? All right. I see no hands. All right. I’m serious about that now.
(Emphasis added.) Jones was not restrained for the remainder of his two-day trial.[8] The defense did not move for a mistrial.
¶ 24. Here, the trial judge went through a detailed hearing on whether or not Jones was a security concern. The two MDOC transport officers stated they had orders to keep Jones restrained, and one officer stated he did not feel comfortable having Jones unrestrained. The prosecutor agreed. Jones’s attorney did not object to the restraints, but he did express concern that they should not be “obvious.”
¶ 25. It is clear from the transcript that the restraints, found on Jones’s waist and legs, were not “readily apparent” to the jury, but when they were seen by the jury, the trial judge ordered them removed. The judge also attempted to keep the appearance of Jones’s restraints at a minimum by having Jones remain seated as the jury entered and exited the courtroom. Finally, the trial judge instructed the jury twice to disregard the restraints as proof of innocence or guilt.
¶ 26. Jones makes the argument that when the trial judge had Jones’s restraints removed, it indicated his initial decision to leave Jones’s restraints on was “plain error,” and Jones’s conviction should be reversed. We find no merit to this argument. Removing the restraints indicated that the trial judge wanted to prevent any prejudice to Jones. There was no evidence that Jones was prejudiced by temporarily appearing before the jury in restraints, especially in light of the trial judge’s two instructions to the jury that the restraints were immaterial to the charges before them. The trial judge did not abuse his discretion in this regard.
3. Suppression of Audio-Recorded Statements
¶27. Jones argues that he was prejudiced when the trial court failed to suppress an audio recording of his interview[9] with law enforcement, which he claims was taken in violation of his Miranda rights. Jones contends he invoked his right to counsel at the interview, but the officers proceeded to coerce, intimidate, and confuse him. Additionally, he states his signed waiver-of-rights form is invalid because it was involuntary.
¶ 28. It is well established that an appellate court:
will reverse a trial court’s ruling on a motion to suppress “if the incorrect legal principle was applied; if there was *529 no substantial evidence to support a voluntary, knowing, and intelligent waiver of Miranda rights; and if the denial was a result of manifest error.”... “[T]he trial judge must determine beyond a reasonable doubt that a confession was voluntary and knowing and that the defendant was given his Miranda rights prior to any custodial interrogation.” This is a factual determination made by the trial court based on the totality of the circumstances.
Redmond v. State, 66 So.3d 107, 111 (¶ 12) (Miss.2011) (internal citations omitted).
¶ 29. The pretrial hearing on Jones’s pro se motions included allegations of Miranda rights violations in a pleading entitled “Statement of Facts.” The judge found no Miranda violation, and the audio recording of the interviews was entered into evidence during Officer Nichols’s direct examination. We find the trial court’s ruling supported by substantial evidence.
¶ 30. At the hearing, Officer Nichols and Jones testified about the two interviews on October 24, 2009, and December 4, 2009. In the first interview, Officer Nichols stated Jones did not offer much useful information for the investigation. In the second interview, Jones implicated others involved in the scheme. At both interviews, Jones was advised of his Miranda rights before questioning began. Jones indicated he understood those rights, and signed a Miranda waiver form. The two signed waiver-of-rights forms were introduced into evidence. In the December 2009 meeting, Officer Nichols testified that Jones signed the waiver about ten minutes after he had been read his rights, but before he gave a statement that officers could use against him. The audio recording corroborates Officer Nichols’s testimony.
¶ 31. Jones contends the second interview improperly continued after Jones requested a lawyer. Under Miranda, the accused must be warned of the right to remain silent and the right to an attorney before any custodial interrogation occurs. Barnes v. State, 30 So.3d 313, 316 (¶ 8) (Miss.2010) (citing Miranda v. Arizona, 384 U.S. 436, 479, 86 S.Ct. 1602, 16 L.Ed.2d 694 (1966)). “Once a defendant asks for counsel, he cannot be interrogated further until counsel has been made available, ‘unless the accused himself initiates further communication, exchanges, or conversations with the police.’ ” Id. at 316-17 (¶ 8) (quoting Edwards v. Arizona, 451 U.S. 477, 484-85, 101 S.Ct. 1880, 68 L.Ed.2d 378 (1981)).
¶ 32. At the beginning of the second interview, while Jones did request a lawyer directly after his Miranda rights were read, he proceeded to initiate further conversation with Officer Nichols, who warned Jones that since he had requested a lawyer, if he continued to talk, it was of his own free will. Even so, Jones continued to converse with Officer Nichols for approximately ten minutes before he signed the waiver-of-rights form. Shortly after, Jones voluntarily told Officer Nichols he was willing to make a statement without a lawyer because he “had nothing to hide.” Approximately thirty minutes later, Jones requested a lawyer again, but he continued his conversation with Officer Nichols. At no point was Jones coerced into talking, nor was he threatened with words and actions “likely to elicit an incriminating response,” as Jones argues. See Rhode Island v. Innis, 446 U.S. 291, 301, 100 S.Ct. 1682, 64 L.Ed.2d 297 (1980). The interview proceeded for a total of approximately an hour and twenty minutes. We cannot say from these facts that Jones’s Miranda rights were violated because Jones continued the conversation even after he requested counsel.
*530 ¶33. In sum, Jones’s waiver of Miranda rights was voluntary, and his continuing to speak without the presence of his requested attorney was also voluntary. Accordingly, the trial court did not abuse its discretion in finding no Miranda violation.
4. Sufficiency and Weight of the Evidence
¶ 34. Jones argues that the State failed to prove beyond a reasonable doubt the essential elements of uttering forgery— specifically “guilty knowledge” and “intent to defraud.” Therefore, Jones submits the sufficiency and weight of the evidence were inadequate, and his motions for a directed verdict, JNOV, or alternatively a new trial should have been granted.

A. Sufficiency of the Evidence

¶ 35. A motion for a directed verdict and a motion for a JNOV challenge the sufficiency of the evidence. Bush v. State, 895 So.2d 836, 843 (¶ 16) (Miss.2005). When reviewing the denial of these motions, “the relevant question is whether, after viewing the evidence in the light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt.” Id. (citation omitted). All credible evidence supporting the defendant’s guilt will be accepted as true, and the evidence will be considered in the light most favorable to the State. McClain v. State, 625 So.2d 774, 778 (Miss.1993).
¶ 36. Mississippi Code Annotated section 97-21-59 (Rev.2006) states in pertinent part:
Every person who shall be convicted of having uttered or published as true, and with intent to defraud, any forged, altered, or counterfeit instrument ... the forgery, altering, or counterfeiting of which is declared by the provisions of this chapter to be an offense, knowing such instrument ... to be forged, altered, or counterfeited, shall suffer the punishment herein provided for forgery.
It was undisputed that the checks presented to the Money Tree were in Jones’s prior possession. Therefore, “[a] rebutta-ble presumption of his guilty knowledge arose. ‘It is well settled that either unexplained or unsatisfactorily explained possession of a forged instrument by the defendant is prima facie evidence that he either committed the forgery himself, or procured another to do so.’ ” Cannady v. State, 855 So.2d 1000, 1003 (¶ 9) (Miss.Ct.App.2003) (quoting Rowland v. State, 531 So .2d 627, 630 (Miss.1988)).
¶ 37. Jones did not present a case after the State rested. Jones explained in the second audio-recorded interview that he obtained the checks from Ellis Urshery, who used people to “work” and then cash the checks. This statement does not rebut the State’s prima facie case for “guilty knowledge.” While it is a reasonable explanation for possession of the forged check, Jones admitted knowledge and involvement in the check-cashing scheme. Jones claims the testimony of Officer Nichols, Tutor, and Dowl failed to establish that the checks were forged, or Jones knew they were forged. We disagree. There was no record of an account belonging to Real’s Trucking at Woodforest Bank, and no evidence the company even existed. In the second interview, Jones admitted knowledge of a fraudulent check-cashing scheme. The remaining factual discrepancies Jones points out in his brief relate to questions of fact for the jury to decide, or questions that might have been posed at trial on cross-examination, and not the sufficiency of the evidence. Viewing the evidence in the light most favorable to the State, a rational trier of fact could have found all of the elements of uttering forgery beyond a reasonable *531 doubt. Accordingly, the trial court did not err in denying Jones’s motions for a directed verdict or JNOV.

B. Weight of the Evidence

¶ 88. “A motion for [a] new trial challenges the weight of the evidence. A reversal is warranted only if the lower court abused its discretion in denying a motion for [a] new trial.” Dilworth v. State, 909 So.2d 731, 737 (¶ 20) (Miss.2005) (quoting Howell v. State, 860 So.2d 704, 764 (¶ 212) (Miss.2003)). This Court “will only disturb a verdict when it is so contrary to the overwhelming weight of the evidence that to allow it to stand would sanction an unconscionable injustice.” Bush, 895 So.2d at 844 (¶ 18). The evidence will be considered in the light most favorable to the verdict. Id.
¶ 39. Jones argues that the State did not conclusively establish that he forged the check, and the testimony from Tutor and Dowl is vague and conflicting. We see no such conflict, and regardless, “[t]he jury is the sole judge of the weight of the evidence and the credibility of the witnesses.” Mohr v. State, 584 So.2d 426, 431 (Miss.1991). The jury was presented with substantial evidence to support Jones’s conviction for uttering forgery. Accordingly, the trial court did not abuse its discretion in denying Jones’s motion for a new trial.
¶ 40. THE JUDGMENT OF THE CIRCUIT COURT OF TUNICA COUNTY OF CONVICTION OF UTTERING FORGERY AND SENTENCE AS A HABITUAL OFFENDER OF TEN YEARS IN THE CUSTODY OF THE MISSISSIPPI DEPARTMENT OF CORRECTIONS WITHOUT ELIGIBILITY FOR PAROLE OR PROBATION AND TO PAY RESTITUTION OF $950.09 IS AFFIRMED. ALL COSTS OF THIS APPEAL ARE ASSESSED TO TUNICA COUNTY.
LEE, C.J., IRVING AND GRIFFIS, P.JJ., ISHEE, ROBERTS, CARLTON, MAXWELL, FAIR AND JAMES, JJ., CONCUR.

. The indictment stated the incident occurred on October 15, 2009, which was a Thursday, but the Money Tree employee who waited on Jones testified the incident took place on a Saturday.

. Miranda v. Arizona, 384 U.S. 436, 86 S.Ct. 1602, 16 L.Ed.2d 694 (1966).

. Under a motion filed with this Court, law students from the University of Mississippi School of Law Criminal Appeals Clinic were appointed as special counsel for Jones. Law students Lauren Fanning and Phillips Strickland prepared Jones's brief under the supervision of Attorney-Professor Phillip W. Broad-head, director of the clinic.

. The trial judge granted the State's pretrial motion to amend the indictment, changing the name "Linda Taylor” to "Linda Tutor.” The incorrect name was due to a scrivener's *525 error. On appeal, the State discusses this amendment, but Jones did not raise this matter as a point of error in his brief; so we will not discuss it.

. In his brief, Jones claims he was "forced” to wear shackles. In actuality, it appears from the transcript that Jones was transferred to the courthouse already in restraints "by policy,” and the issue was whether the restraints should remain on in the presence of the jury, even though they were not readily apparent.

. On appeal, the State discussed Jones wearing his prison attire the first day of trial, but this matter was not raised in Jones's brief; so we decline to discuss it further.

. Jones refused to wear the civilian clothes his attorney provided him, claiming they were not his, did not fit, and were dirty.

. According to the transcript, during voir dire and jury impanelment, Jones appeared shackled before the jury for approximately one hour and ten minutes, and during the State's opening statement for about fifteen minutes, for a total of approximately one hour and twenty-five minutes. It is not clear from the record if the restraints were visible this entire time or not.

. Jones's arguments deal only with the second interview in December 2009.